**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,**

            **Plaintiff,**

    **v.**                             **Civil Action 2:23-cv-3010
Judge Michael H. Watson
Magistrate Judge Kimberly A. Jolson**

**UNITED HEALTHCARE
SERVICES, INC.,**

            **Defendant.**

**<u>OPINION & ORDER</u>**

Before the Court are two motions to compel, one brought by each side. (Docs. 35, 36).

Defendant's Motion (Doc. 35) is **GRANTED in part, DENIED in part**, and otherwise **HELD in**

**ABEYANCE**. Plaintiff's Motion (Doc. 36) is **DENIED in part** and otherwise **HELD IN**

**ABEYANCE**.

**I.       BACKGROUND**

Briefly, this case is about Charging Party Amanda Stone's termination from working as a

supervisor of clinical administration at United Healthcare Services, Inc. ("UHC") (Doc. 1

(complaint)). As alleged, in October 2021, Defendant implemented a policy that required

employees who had various kinds of in-person contact with others to be vaccinated against

COVID-19. (*Id.* at ¶ 21). Although "Stone was a full-time telecommuter," Defendant notified

Stone that she had to comply with the policy. (*Id.* at ¶ 23). Plaintiff alleges that Stone's sincerely

held religious beliefs prevent her from receiving the COVID-19 vaccine in good conscience. (*Id.*

at ¶ 24). Particularly, Plaintiff says Stone's religious beliefs conflict with her understanding that

the COVID-19 vaccines "were developed or tested using cell lines derived from aborted fetuses."

(*Id.*; *see also id.* at ¶ 14 (alleging Plaintiff maintains a sincerely held religious belief that "human life is sacred; human life is a gift from God; and abortion is gravely wrong and contrary to the commandments and teachings of the Christian Bible")).

Stone submitted two religious accommodation forms, seeking an exemption from receiving the vaccine on religious grounds. (*Id.* at ¶ 29–42). Defendant denied both requests and eventually terminated Stone's employment. (*Id.*). Plaintiff now alleges that Defendant's failure to accommodate her sincerely held beliefs violates sections 701(j) and 703(a) of Title VII, 42 U.S.C. §§ 2000e(j) and 2000e-2(a). (*Id.* at ¶ 43).

Recently, the parties brought a discovery dispute before the Court. (Docs. 32, 33). Because they were unable to resolve their differences informally, each side filed a motion to compel. (Docs. 35, 36). The motions are fully briefed and ready for review. (Docs. 45, 46, 48, 49).

## II.    STANDARD

Two federal rules govern the Motions to Compel. Rule 26(b) of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Rule 37, for its part, allows for a motion to compel discovery when a party fails to answer interrogatories submitted under Rule 33 or to provide proper responses to requests for production of documents under Rule 34. *See* Fed. R. Civ. P. 37(a)(1), (3). "The proponent of a motion to compel discovery bears the initial burden of proving that the information sought is relevant." *Gruenbaum v. Werner Enters., Inc.*, 270 F.R.D. 298, 302 (S.D. Ohio 2010) (citation omitted). "While relevancy is broad, 'district courts have discretion to limit the scope of discovery [when] the information sought is overly broad or would prove unduly burdensome to produce.'" *Plain Local Sch. Dist. Bd. of Educ. v. DeWine*, 335 F.R.D. 115, 119 (N.D. Ohio 2020) (alteration

2

in original) (quoting *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007)). At base, "the scope of discovery is within the sound discretion of the trial court." *Stumph v. Spring View Physician Practices*, LLC, No. 3:19-CV-00053-LLK, 2020 WL 68587, at *2 (W.D. Ky. Jan. 7, 2020) (quotation marks and citations omitted).

## III. DISCUSSION

The Court first considers Defendant's motion, then Plaintiff's.

### A. Defendant's Motion to Compel

Defendant seeks to compel Plaintiff to respond to two interrogatories and two requests for production. (*See* Doc. 35-2 at 18 (Interrogatory No. 6), 33 (Interrogatory No. 24); 45–46 (Request for Production No. 7); Doc. 35-4 at 5 (Request for Production No. 62)). Interrogatory No. 6 and Request for Production No. 7 concern Stone's vaccination history. The interrogatory asks Plaintiff to identify any vaccines Stone has received as an adult. (Doc. 35-2 at 18 (requesting Plaintiff identify the type of vaccine, the date it was administered, the location where it was administered, the manufacturer of the vaccine, and whether the vaccine was required for employment)). For its part, the request for production asks Plaintiff to produce all documents in its possession, custody, or control regarding any vaccinations that Stone received as an adult. (*Id.* at 45–46). Interrogatory No. 24 asks Plaintiff to identify "each and every medication, vaccine, food item, cosmetic product, and other product" that Stone has rejected because of her religious beliefs. (*Id.* at 33). And Request for Production No. 62 seeks all of Stone's medical records since she turned 18. (Doc. 35-4 at 5). Defendant argues this discovery is both relevant and proportional to the needs of the case.

### 1. Relevance

To begin, Defendant contends that the sought after discovery is relevant to the *prima facie* Title VII case. (Doc. 35-1 at 7–12). The Court agrees. To meet its burden under Title VII, Plaintiff

must demonstrate that Stone holds "a sincerely held religious belief that conflicts with an employment requirement." *Stanley v. ExpressJet Airlines, Inc.*, 808 F. App'x 351, 356 (6th Cir. 2020). Evidence that Stone may have acted in a manner inconsistent with her alleged beliefs speaks at the very least to the sincerity aspect of this burden. *See, e.g.*, *Ackerman*, 16 F.4th at 181 (6th Cir. 2021) ("Whether prisoners have 'wavered in their dedication' also appears to be relevant to the sincerity analysis."); *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 57 (1st Cir. 2002) ("Evidence tending to show that an employee acted in a manner inconsistent with his professed religious belief is, of course, relevant to the factfinder's evaluation of sincerity."); *Cesare v. PACT MSO, LLC.*, 736 F. Supp. 3d 93, 101 (D. Conn. 2024) ("Conflicting statements by the adherent could enable a reasonable jury to doubt the sincerity of the beliefs.") *Gardner-Alfred v. Fed. Rsrv. Bank of New York*, No. 22-CV-1585, 2023 WL 6214863, at *13 (S.D.N.Y. Sept. 25, 2023) ("However, even where the 'truth' of a belief is not open to question, there remains the significant question of whether it is 'truly held'. . . . [T]h[e] analysis is most useful where extrinsic evidence is evaluated." (citations and internal quotation marks omitted)); *see also Equal Emp. Opportunity Comm'n v. Publix Super Markets, Inc.*, 481 F. Supp. 3d 684, 699 n.16 (M.D. Tenn. 2020) (finding sincerity analyses done under the Religious Land Use and Institutionalized Persons Act instructive to the question of sincerity in Title VII cases). In fact, Plaintiff's own guidance states that factors that "might undermine an employee's credibility" as to sincerity could include whether the employee "has behaved in a manner markedly inconsistent with the professed belief." U.S. Equal Employment Opportunity Commission, *Religious Discrimination*, found at https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination (last accessed April 10, 2025).

What's more, courts have allowed discovery of vaccination or medical records in similar circumstances. *See, e.g.*, *Sulander v. Syneos Health*, LLC, No. 5:23-CV-539-FL, 2025 WL 662394, at *9 (E.D.N.C. Feb. 28, 2025) ("Any medical information related to vaccine history and motivations related to vaccination are relevant as they may shed light on Plaintiffs' reasons for refusing the COVID-19 vaccine."); *Camp v. L.A. Arena Co., LLC*, No. 5:22-CV-02220, 2024 WL 1634095, at *3 (C.D. Cal. Mar. 22, 2024); *Kennedy v. PEI-Genesis*, No. 2:23-CV-00164-JDW, 2023 WL 3898893, at *3 (E.D. Pa. June 8, 2023) ("If Mr. Kennedy believes that 'ingestion of a medication or other chemical substances defies natural law,' PEI-Genesis has the right to discover which, if any, types of chemical substances that belief allowed Mr. Kennedy to consume and to cross-examine him as to the difference between those substances and the COVID-19 vaccine."); *Villareal v. Rocky Knoll Health Care Ctr.*, No. 21-CV-729, 2022 WL 875287, at *2 (E.D. Wis. Mar. 24, 2022) (holding that where a plaintiff alleged her religious beliefs required her to decline medical intervention in the absence of sickness, her medical records were relevant to determining whether she had a history of acting on that belief).

Plaintiff's arguments to the contrary are unavailing. Plaintiff says that information and documents related to Stone's vaccination history or other medical records are irrelevant to determining whether her beliefs about the COVID-19 vaccine are insincere since "the EEOC has presented sufficient evidence to establish that Stone's religious belief is sincere." (Doc. 46 at 9). Oddly, in making this argument, Plaintiff appears to be asking the Undersigned to rule that Plaintiff has "as a matter of law" established the sincerity of Stone's religious beliefs. (*Id.* (citing *Moussazadeh v. Texas Dep't of Crim. Just.*, 703 F.3d 781 (5th Cir. 2012) (reversing a lower court's grant of a motion for summary judgment), *as corrected* (Feb. 20, 2013))). This request confuses the question of relevance with the question of merit. At this stage, the Undersigned considers

whether the discovery sought is "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Whether Stone is sincere in her religious beliefs as a matter of law is appropriately answered on a motion for summary judgment, not on a motion to compel. *Cf. Decker v. Chubb Nat'l Ins. Co.*, No. 1:15-CV-88, 2015 WL 5954584, at *3 (S.D. Ohio Oct. 14, 2015) ("Defendants' request for a merits-based assessment is premature . . . arguments directed at the merits of the plaintiffs' claims or the viability of affirmative defenses should be addressed by way of dispositive motion or at trial and not during a discovery dispute."), *report and recommendation adopted*, No. 1:15-cv-88, 2015 WL 6872937 (S.D. Ohio Nov. 9, 2015). So, Plaintiff's argument holds little water at this stage.

Plaintiff's next argument fares no better. It contends the discovery sought is not relevant because courts have held that religious adherents are not required to act consistently with their alleged beliefs to demonstrate sincerity. (Doc. 46 at 8 (citing *Ackerman v. Washington*, 16 F.4th 170, 181 (6th Cir. 2021) (considering the sincerity of a prisoner's religious beliefs under the Religious Land Use and Institutionalized Persons Act); *Sturgill v. Am. Red Cross*, 114 F.4th 803 (6th Cir. 2024) (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981)) ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."))). While this may be true, Plaintiff again misunderstands Rule 26's broad reach. At base, sincerity is a factual finding. *Speer v. UCOR LLC*, No. 3:22-CV-426, 2024 WL 4370773 (E.D. Tenn. Oct. 1, 2024). As previously explained, acts that are inconsistent with a stated belief can be relevant to the factfinder's determination of sincerity. *See, e.g., Ackerman*, 16 F.4th at 181; *Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d at 57. As a result, the information

Defendant seeks is relevant, even if Plaintiff ultimately meets its evidentiary burden on sincerity later in this case.

Finally, Plaintiff asserts that Defendant "attempts to gather information that it did not request or consider relevant at the time it denied Stone's religious accommodations and fired her." (Doc. 46 at 11). So, says Plaintiff, "Defendant should not be permitted to do, through this litigation, what it failed to do before denying Stone's religious accommodations and firing her." (*Id.*). The Court is unpersuaded, as Plaintiff does not explain or provide supporting caselaw suggesting why these circumstances matter for the question of relevancy.

In the end, the Court concludes that the discovery sought is relevant. Now, the Court turns to whether it is also proportional to the needs of the case.

### 2. Proportionality

In assessing the proportionality of a request to the needs of the case, the Court considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "[T]he Court has discretion to limit or even preclude discovery which meets the general standard of relevance found in Rule 26(b)(1) if the discovery is unreasonably cumulative or duplicative, can be obtained from some other source which is more convenient, less burdensome, or less expensive, or if the party seeking the information has had ample opportunity to obtain it in the action." *Brown v. Mohr*, No. 2:13-CV-0006, 2017 WL 2832631, at *1 (S.D. Ohio June 30, 2017), *aff'd*, No. 2:13-CV-06, 2017 WL 10056799 (S.D. Ohio Nov. 6, 2017).

Up front, several factors generally weigh in favor of granting Defendant's requests. As explained above, the requested discovery is potentially meaningful to a factfinder's decision on Stone's sincerity. There is no reason to think that Defendant already has access or better relative access to Stone's medical records or related information. And Plaintiff does not argue that the expense of producing the proposed discovery outweighs the benefits. (*See generally* Doc. 46). Instead, Plaintiff provides other theories why Defendant's discovery requests are off limits.

Plaintiff first contends that all four discovery requests invade Stone's privacy because they seek "confidential and sensitive health information for her entire adult life," and violate her "right to privacy in [her] medical information." (Doc. 46 at 15). But the cases Plaintiff cites are inapposite to the circumstances presented. *E.g.*, *United States v. Hoyt*, No. 1:15-CR-1, 2016 WL 776595 (S.D. Ohio Feb. 29, 2016) (considering an application to unseal a forensic mental health evaluation in a criminal case). What's more, Plaintiff's allegations in this case—that Stone's sincerely held religious beliefs require her to decline certain medical treatments—have put at least some of Stone's medical history at issue. *Villareal*, 2022 WL 875287, at *2; (*see also* Doc. 1 at ¶ 15 (alleging Stone suffered multiple miscarriages and gave birth to a stillborn child, moving Stone to deep devotion in her religious beliefs)). And at base, the protective order in this case sufficiently protects Stone's privacy interests in the information or records disclosed. (*See* Doc. 22); *cf. In re Bank of Am. Wage & Hour Emp. Pracs. Litig.*, 275 F.R.D. 534, 541 (D. Kan. 2011) ("Generally, concerns about confidentiality or the disclosure of private or sensitive information are not a sufficient basis to withhold discovery and are best addressed in the form of a protective order.").

Plaintiff further argues that the discovery requests are unreasonably duplicative and cumulative. Its only support is that Defendant has "already extensively questioned" Stone about

8

her religious beliefs and some of her medical history in her deposition. (Doc. 46 at 18). Stone's previous deposition does not bar Defendant from seeking the underlying medical records or related information in written form. *Cf. Allen v. Cam's Transp. Co.*, No. 3:22-CV-403, 2024 WL 3093480 (E.D. Tenn. June 20, 2024) (finding a deposition nonduplicative and allowing it to proceed where the plaintiffs' only arguments were that they provided the deponent's medical records and others testified as to the deponent's condition); *see also* Fed. R. Civ. P. 26(d)(3)(A) (allowing methods of discovery to be used in any sequence). In other words, subsequent written discovery on Plaintiff's medical history is not so unreasonably duplicative or cumulative as to set it outside the bounds of Rule 26.

Plaintiff also attempts to classify these discovery requests—and Defendant's questioning during Stone's depositions—as harassing. (Doc. 46 at 18). It highlights that Stone's deposition took an emotional toll. (*Id.*). And, says Plaintiff, allowing even more discovery would have a chilling effect on others who seek to vindicate their rights in similar contexts. (*Id.* at 18–19). While the Court does not doubt that some lines of questioning have impacted Stone, this is not a reason, without more, to conclude that the pertinent discovery requests were made to harass Stone or to retaliate against her for filing an EEOC charge.

Plaintiff's final argument against disclosure is that the discovery requests are overbroad. To begin, Plaintiff says because Stone testified that she "did not know that any vaccines or other drugs could be developed or tested using aborted fetal cell lines until late 2020," any medical treatment or vaccination records before 2020 could not shed light on Stone's sincerely held religious beliefs at the time she refused the COVID-19 vaccine. (*Id.* at 13 (citing Doc. 43 at 160, 162–62)). But, again, this goes to credibility. Whether a factfinder finds credible Stone's testimony about her sincerely held religious beliefs remains to be seen. (*See also* Doc. 1 at ¶ 15

(Plaintiff's allegation that Stone was "move[d]" to "deep devotion" of her beliefs about human life and abortion as early as 2016)). Stone's testimony alone does not establish Defendant's requests as impermissibly over-broad. *Cf. Camp*, 2024 WL 1634095, at *3 (rejecting a plaintiff's objection to an interrogatory based on over-breadth and ordering him to identify all vaccinations and immunizations he received since he became an adult, including the dates and types of the vaccines).

More persuasive are Plaintiff's critiques of the scope of certain requests. For instance, it highlights that in Interrogatory No. 24, Defendant seeks information about any products Stone has rejected because of her religious beliefs generally, not only those beliefs alleged in this lawsuit. And in Interrogatory No. 6, Defendant seeks narrative information that would seemingly be evident in the records produced pursuant to Request for Production No. 7. As such, while the Court grants Defendant's request to compel Plaintiff to answer Interrogatory Nos. 6 and 24, the Court has narrowed their scope, as detailed in Section IV of this opinion.

As for Request for Production Nos. 7 and 62, the parties must do more work. First, though Plaintiff objects to the breadth of Request for Production No. 62, (Doc. 46 at 13–14), Plaintiff apparently declined to work with Defendant on how to narrow the scope. (Doc. 48 at 12). The Court agrees that the breadth of Request for Production No. 62 is potentially disproportional to the nature of this suit. (*See* Doc. 35-4 (including in the request records of medical bills, insurance claims, X-rays, MRIs, referral slips, counseling records, etc.)). But the parties, not the Court, are in the best position to tailor Request for Production No. 62.[1] What's more, the parties are also

---

[1] Defendant's Motion to Compel specifically asks for an order that Plaintiff produce "medical records evincing any medications, medical procedures, vaccines, food, cosmetics, and other products that Ms. Stone has *accepted* despite her religion or *rejected because* of her religious beliefs. (Doc. 35-1 at 1–2). Though Defendant cites to Request for Production 62 (Doc. 35-1 at 5), the wording of this ask does not exactly track with the text of the Request for Production 62 which requires "All documents that record, reflect, refer or relate to any physical health history regarding any physical illness, injury, impairment, disability, malady or condition, surgery, or medical procedure that Amanda Stone has had as an adult (i.e., since turning 18), including but not limited to medical records, medical reports,

better equipped to determine the appropriate method of production for both requests. In particular, Defendant has offered that instead of producing some of records itself, Plaintiff could provide Defendant with signed authorizations for Stone's healthcare providers so that Defendant may obtain the records via subpoena. (Doc. 35-1 at 15). This would considerably lessen the burden and expense of responding to both requests for Plaintiff. Accordingly, the parties are **ORDERED** to confer to come to an agreement on the scope of Request for Production No. 62 and method of production for Request for Production Nos. 7 and 62.

### B. Plaintiff's Motion to Compel

Meanwhile, four interrogatories and six requests for production are at issue in Plaintiff's Motion to Compel. (*See* Doc. 36-6 at 7–8 (Interrogatory No. 2); Doc. 36-7 at 12–13 (Request for Production No. 6), 16–17 (Request for Production No. 13), 20–21 (Request for Production No. 19), 25 (Request for Production No. 23); Doc. 36-8 at 6–7 (Integratory No. 7), 9–10 (Interrogatory No. 9), 10–11 (Interrogatory No. 10); Doc. 36-9 at 6–8 (Request for Production No . 39), 11–12 (Request for Production No. 42)). Two of these requests, Interrogatory No. 9 and Request for Production No. 42, relate to "Defendant's admissions about the role of aborted fetal cell lines in the testing and development of COVID-19 vaccines[.]" (Doc. 36 at 1). Requests for Production Nos. 6, 13, and 23, seek discovery related to Stone's workplace email account. (*Id.* at 2). Interrogatory No. 10 asks for information and documents about vacant positions that did not require the COVID-19 vaccine. (*Id.*). And Interrogatory Nos. 2 and 7 and Request for Production Nos. 19 and 39 seek discovery on other employees who also asked to be excepted from the vaccine

---

consultation notes, consent forms, medical bills, prescription records, laboratory reports, MRI records, X-rays, referral slips, hospital records, insurance claims or records, doctors' reports, doctors' slips, and counseling records." (Doc. 35-4). Because the Court concludes that the parties must confer further on this request, they are encouraged to discuss the exact nature of what Defendant seeks.

policy or who were excluded from the policy because their position did not have in-person contacts.  (*Id.*).

### 1. Interrogatory No. 9 and Request for Production No. 42

Interrogatory No. 9 and Request for Production No. 42 both concern information related to a document Defendant produced called "Executive Responses to Employees."  (*See* Doc. 36-10). On its face, the document contains "executive responses" to "employee questions" about the COVID-19 vaccine policy.  (Doc. 36-10).  Nowhere does the document list the names or email addresses of either the employees asking the questions or the executives responding.  (*See generally id.*).  But of note, one employee email asks about data behind "involvement of fetal tissue in development of the COVID vaccines(s)."  (Doc. 36-10 at 4).  Among other things, the executive response says,

> [P]rior to producing their vaccines, Pfizer and Moderna performed tests using fetal cell lines to ensure the vaccines work . . . . Fetal cell lines are not the same as fetal tissue.  Fetal cell lines are cells that were grown in a lab over decades, descended from cells taken from elective abortions in the 1970s and 1980s.  No fetal cell lines were used to manufacture the Pfizer and Moderna vaccines, and they are not inside those vaccines . . . . Johnson & Johnson used fetal cell lines in the development and manufacture of its vaccines . . . . But to be clear, while lab-replicated fetal cell lines were used during the J&J production process, the vaccine itself does not contain any fetal cells.

(*Id.*).  Plaintiff's discovery requests seek to discover more information about who sent the employee emails; who sent the responses; to whom responses were sent; and when responses were sent, as well as complete copies of the emails.  (Doc. 36-1 at 4).

The dispute over these requests is rooted in what each side claims the "Executive Responses to Employees" document is.  Plaintiff labels this document an "admission" that "the COVID-19 vaccines were tested or developed using fetal cell lines 'descended from cells taken from elective abortions.'"  (Doc. 36-1 at 4).  The EEOC says that it is "a compilation of statements

made by one or more of Defendant's executives, authorized to speak for the company, in response to employe emails inquiring about matters relating to the company's vaccine mandate[.]"  (Doc. 49 at 2 (cleaned up)).  Therefore, any communications or documents related to it are relevant to Defendant's defenses.  (Doc. 36-1 at 5 (noting that Defendant identified the document as one that supports, evidences, or relates to one of its affirmative defenses); Doc. 36-7 at 14)).

For its part, Defendant avers that Plaintiff makes too much of this document.  According to Defendant, an employee named Taylor Joseph created the document in October 2021.  (Doc. 45-2 (declaration of David Yerich—Director of eDiscovery for UnitedHealth Group, Incorporated ("UHG"))).  Defendant represents it is a "single, standalone document," which does not reflect its position on "any issue" and that Mr. Joseph has no recollection of whether the employee emails or executive responses contained therein were "actual conversations."  (Doc. 45 at 6).  Nonetheless, it bears no relevance to this action because even if individual employees discussed the potential connection between fetal cell lines and COVID-19 vaccines, the EEOC cannot demonstrate they are corporate admissions.  (*Id.* at 9–10).

Looking past the parties' dispute about what the document is or is not, Defendant asserts that there is no reason to believe that more information about the executive responses or employee questions even exist.  (Doc. 45 at 8).  Defendant ran searches of Mr. Joseph's email, which did not turn up documents or emails containing the terms "fetal cell line" or "abortion."  (*Id.* at 9; *see* Doc. 45-2 at 3–4 (declaration of UHG's Director of eDiscovery affirming the same)).  And Plaintiff's request—that Defendant search through the emails of hundreds of executives to look for potentially nonexistent information—is not proportional to the needs of this case.  (Doc. 45 at 10–11).  At any rate, says Defendant, it no longer intends to rely on the document and plans to amend

its responses to Plaintiff's discovery requests to "remove[] this document from any Answer to Interrogatory and Response to Request for Production." (*Id.* at 7).

On this record, the Court does not take a position on what the Executive Responses document is. But it appears to be relevant enough to this matter that the Court requires more effort from the parties. Though the Court has no reason to doubt that Defendant's search of Mr. Joseph's email was unfruitful, both sides claim the other failed to cooperate in negotiating further search terms or custodians. (*See* Doc. 36-1 at 9; Doc. 45 at 10). Regardless of where the blame lies, the Court orders such cooperation now. Specifically, the parties are **ORDERED** to negotiate further search terms and/or custodians relevant to these discovery requests. The Court expects the parties to do so in good faith.

### 2. *Request for Production Nos. 6, 13, and 23*

Plaintiff's second set of requests concern Stone's employment history at UHC, including documents relating to Stone's separation from employment and files or documents Defendant has maintained regarding Stone. (Doc. 36-1 at 11). Of particular note are documents responsive to these requests that may be located in Stone's employee email account. Plaintiff first represented that Defendant revealed that the email account was deleted. (Doc. 36-1 at 10). Plaintiff asked the Court to order Defendant to produce documents relating to the destruction of the email address, including Defendant's efforts to preserve information relevant to this case. (*Id.* (arguing it has made a preliminary showing of spoliation required for the Court to order production of litigation hold letters)).

But then, Defendant provided an update: Stone's account was not deleted wholesale, as Defendant originally thought. (Doc 45 at 11). A legal hold was added to Stone's email account on April 4, 2022—the business day after Stone filed her EEOC charge. (Doc. 45-2 at 3 (declaration

of Defendant's Director of eDiscovery); *see also* Doc. 45-4).  Though her email was subject to Defendant's 90-day rolling email retention policy after her termination, her emails were preserved once the legal hold began.  (*Id.*).  And some items that were subject to automated deletion before the hold were recoverable "as they were not fully purged from the mailbox."  (*Id.*).  Defendant avers it has since produced nearly 1,000 documents to Plaintiff from Stone's email account.  (Doc. 45 at 12).

Plaintiff is still upset.  Plaintiff accuses Defendant of ignoring its duty to preserve evidence by either knowingly allowing Stone's emails to be deleted or intentionally deleting them.  (Doc. 49 at 9).  Its only support, other than Defendant's shift in position, is that Defendant has produced emails sent or received by other custodians in excess of what the 90-day retention policy would cover.  (*Id.*).  Plaintiff also assumes bad faith from the fact that Defendant was able to recover some of the emails that were supposedly permanently deleted under the 90-day retention policy.  (*Id.*; *see also* Doc. 45-2 at 2 (quoting Defendant's email retention policy that "once deletion occurs, email message cannot be recovered")).

On this record, the Court declines to allow Plaintiff to discover Defendant's litigation hold correspondence or other communications about the retention or destruction of Stone's account.  Litigation hold letters are generally privileged and outside the realm of discovery.  *Little Hocking Water Ass'n, Inc. v. E.I. Dupont de Nemours & Co.*, No. 2:09-CV-1081, 2013 WL 5311292, at *3 (S.D. Ohio Sept. 20, 2013).  Letters may be subject to production if a party makes a preliminary showing of spoliation.  *Id.*; *see also United States Equal Emp. Opportunity Comm'n v. Aspire Reg'l Partners, Inc.*, No. 2:22-CV-3071, 2024 WL 4986997, at *3 (S.D. Ohio Dec. 5, 2024) (noting spoliation sanction are appropriate where "(1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the accused party destroyed the

evidence with a culpable state of mind; and (3) the evidence destroyed is relevant to the other side's claim or defense.")).  Importantly, though, "speculative claims do not satisfy the party's obligation of making a preliminary showing of spoliation." *EPAC Techs., Inc. v. Thomas Nelson*, *Inc.*, No. 3:12-CV-00463, 2015 WL 13729725, at *6 (M.D. Tenn. Dec. 1, 2015).

Here, Defendant received Stone's unperfected EEOC charge on Saturday, April 2, 2022, at 9:13 P.M.  (*See* Doc. 45-4).  A legal hold was added to her email account the next business day, April 4, 2022.  (Doc. 45-2 at 3).  Courts have held the filing of an EEOC charge triggers an employer's duty to preserve.  *Goodale v. Elavon*, Inc., No. 23-5013, 2023 WL 9111441, at *5 (6th Cir. Dec. 12, 2023) (upholding a district court's determination that an employer's duty to preserve evidence did not begin until the plaintiff filed an EEOC charge); *Aspire Reg'l Partners, Inc.*, 2024 WL 4986997, at *4 (finding that the defendant was on notice of its duty to preserve when it received notice of an EEOC charge and while the EEOC investigation was active).  As it stands, Plaintiff has failed to make a preliminary showing that emails were destroyed, either purposefully or negligently, after the litigation hold was initiated.  *Cf. Aspire Reg'l Partners, Inc.*, 2024 WL 4986997, at *4 (finding a preliminary showing of spoliation where the defendants did not contest that the charging party's email account was destroyed after the EEOC charge was filed).  Plaintiff assumes this to be the case based on what emails it thinks Defendant either should possess or should have been able to recover.  (Doc. 49 at 9–10).  But this speculation—even in light of Defendant's shifting position on whether the email account was deleted—is not enough to bring Defendant's litigation hold communications into discoverable territory.

The better course is for the parties to discuss Plaintiff's concerns.  Particularly, the EEOC claims that despite Defendant's new production, it "does not know how many [of Stone's] emails [exist] or how far back in time Stone's emails have been retained." (*Id.* at 9).  Plaintiff also says

that because of the impending discovery deadline, it was not able to issue additional discovery requests related to Stone's email account or negotiate search terms. (*Id.*). These concerns are not unfounded. Fortunately, since the Court is staying the discovery deadlines, the parties now have time to resolve these questions and negotiate search terms for Stone's email account, if necessary. So, while the Court **DENIES without prejudice** Plaintiff's request regarding Defendant's litigation hold communications, the parties are **ORDERED** to confer further on discovery related to Stone's email account.

### 3. *Interrogatory No. 10*

Plaintiff next seeks an order compelling Defendant to identify and provide pertinent information about vacant positions available between October 2021 and February 2022, which did not require workers to receive the COVID-19 vaccine. (Doc. 36-8 at 10–11). Defendant said that it agreed to produce this information "as soon as it is able before the close of fact discovery." (Doc. 45 at 14). Defendant did, in fact, produce a supplemental answer to this interrogatory. (Doc. 49 at 11). But Plaintiff is not content. Plaintiff purports that the parties agreed that for other categories of information pertinent to Interrogatory No. 10 not at issue here, Defendant would produce material for certain salary grade positions. (*Id.*). Defendant's supplemental answer did not include information for two of the salary grades. (*Id.*).

This, again, appears to be an issue the parties should have worked out prior to filing their motions to compel. Given the developments in production, it seems that Court intervention may not be necessary. The parties are **ORDERED** to confer further on this specific dispute.

### 4. *Interrogatory Nos. 2 and 7 and Request for Production Nos. 19 and 39*

Plaintiff's last set of requests seek individual discovery related to other UHC employee's exemptions or exclusions to the COVID-19 vaccination policy. Specifically at issue is what the

parties call "individual discovery" about these employees. (Doc. 36-1 at 16). The "individual

discovery" sought includes:

> (a) documents that reflect, contain, describe, or explain any request for an exemption from the vaccine mandate, including but not limited to any reasons for the request; (b) documents that reflect, contain, describe, or explain Defendant's determination regarding the request for exemption, including but not limited to any reasons therefore; and (c) job profiles or job or position descriptions ("job descriptions") that were in effect for the position the person held at the time of the exemption request, at the time of Defendant's determination, or at any time in between.

(*Id.* at 15–16). Plaintiff also seeks "Defendant's exclusion determinations and any reversals

thereof; relevant job descriptions or job profiles for such employees' positions; as well as limited

interrogatory answers regarding the dates and reasons for any exclusion reversals and the dates

and reasons any such employees were subsequently fired." (Doc. 49 at 12).

Defendant contends that it already produced some information about 201 employees who

submitted requests for exemptions. (Doc. 45 at 2, 14–15 (noting Defendant produced information

including each "employee's ID, job title, job codes, line of business, division, state, the employee's

exemption request type, if any (e.g., religious or medical), and details regarding the types of in-

person contacts that determined whether the employee was subject to the vaccination

requirement")). And it produced information about 213 employees who were outside of the scope

of the vaccination policy "because their roles did not require in-person interaction with other

people." (*Id.* at 2, 15). Any more "individual discovery," claims Defendant, is irrelevant, over-

broad, and disproportionate to the case's needs.

### a. Relevance

Plaintiff's defense of the relevance of the "individual discovery" is two-fold. First,

information about other employees who requested exemptions, and the in-person contact

requirements of their positions, speaks to Defendant's assertions that accommodating Stone

presented an undue hardship and that her termination was for a legitimate, non-discriminatory reason. (Doc. 36-1 (citing *Bobnar v. AstraZeneca Pharms. LP*, No. 1:22-cv-2258, 2024 U.S. Dist. LEXIS 214549, at *65 (N.D. Ohio Nov. 26, 2024)). Though Plaintiff acknowledges that Defendant has produced a spreadsheet of some information about the employees who requested exemptions, the spreadsheet does not contain details pertinent to these defenses. (*See* Doc. 49 at 17 (stating the data Plaintiff has does not include detailed determinations of the employees' in-person contacts; job descriptions; or whether other employees who were denied exemptions were later fired)). Second, Plaintiff asserts that information about employees who were excluded from Defendant's vaccine policy, and the in-person contact requirement of their positions, again speaks to whether accommodating Stone presented an undue hardship. (*Id.* at 20).

The through-line of Defendant's relevance counterargument is the 414 identified employees who requested exemptions or were excluded from Defendant's vaccination policy are not similarly situated comparators to Stone. (Doc. 45 at 16–17). Defendant cites Sixth Circuit precedent stating, "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated *in all respects*." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis in original). In Defendant's view, the employees for whom Plaintiff seeks "individual discovery" could never be relevant to Plaintiff's claims because they are not similarly situated in all respects. In other words, their employment circumstances—including their supervisors and job duties—are too different from Stone's. (*Id.* at 17 (noting the identified employees performed 58 different job roles in thirteen different states and "operated under unique state-level contractual requirements.")).

Without commenting on whether the 414 identified employees are "similarly situated" to Stone, the Court observes flaws in Defendant's argument.  First, the requirements for a similarly situated employee are not so narrow.  Following *Mitchell*, the Sixth Circuit made clear that an exact correlation between an employee and the alleged comparator is not required; rather, a plaintiff must show she, or in this case the charging party, is "similarly-situated to the non-protected employee in all *relevant* respects."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) (emphasis in original).  At the discovery stage of litigation, "it is improper to tailor discovery to possible comparators . . . only on a relevance basis."  *Cox v. Gray Media Grp., Inc.*, No. 5:22-CV-00290-KKC-MAS, 2024 WL 1403074, at *4 (E.D. Ky. Apr. 1, 2024), *aff'd*, No. 5:22-CV-290-KKC-MAS, 2024 WL 2412266 (E.D. Ky. May 23, 2024).  In the end, whether other employees are similarly situated is a question for the factfinder.  *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 757 (6th Cir. 2012) (citation omitted).  While Defendant remains free to maintain that none of the identified employees are similarly situated down the road, its argument does not put discovery of these employees out of reach today.  *See id.* at 752 (noting that limiting discovery on potential comparators improperly narrowed the reach of Federal Rule of Civil Procedure 26(b)(1)).

The second flaw in Defendant's position is that Plaintiff alleged Defendant "failed or refused to provide Stone with a reasonable accommodation of her sincerely held religious beliefs."  (Doc. 1 at ¶ 43).  As mentioned, Defendant answered that granting Stone's request for an exemption would have posed an undue hardship.  (Doc. 14 at 18).  The eventual inquiry into undue hardship is "context specific."  *Henry v. S. Ohio Med. Ctr.*, No. 1:22-CV-00679, 2024 WL 4117206, at *3 (S.D. Ohio Sept. 9, 2024) (citation omitted).  Courts have found the treatment of other employees who either have been accommodated for or excluded from an employment policy

20

can be relevant to the undue hardship analysis.  *See, e.g.*, *Brown v. MGM Grand Casino*, No. 2:22-CV-12978, 2024 WL 4819575, at *9 n.13 (E.D. Mich. Nov. 18, 2024) (considering the exclusion of certain employees from a vaccination policy in an undue hardship analysis); *Cox*, 2024 WL 1403074, at *5 ("Although an undue hardship analysis does not involve the use of comparators, whether [the employer] accommodated employees with similar job duties is probative to whether Landis's requested accommodations imposed an undue burden on [the employer].").  So too here; information about the treatment of other employees might speak to whether accommodating Stone would place an undue hardship on Defendant.

For these reasons, the Court concludes that "individual discovery" on employees who either pursued exceptions to Defendant's vaccination policy or who were excluded from the same is relevant to the parties' claims or defenses.

### b.    *Proportionality*

Having established that the "individual discovery" sought is relevant, the Court now turns to Defendant's arguments concerning proportionality and undue burden.  Defendant contends that detailed, individualized interrogatory responses for 414 employees along with corresponding documentation is disproportionate to the needs of a single-claimant case.  (Doc. 45 at 17).  It argues that the discovery would take "dozens if not hundreds of hours to prepare" and the documentation could amount to thousands of pages.  (*Id.* at 19).

Ultimately, the Court concludes that at least some "individual discovery" is proportional to the needs of this case.  Up front, the Court agrees with Plaintiff that details about the identified employees' in-person contacts and Defendant's decision-making process in handling exception requests or exclusions have importance to the resolution of the issues in this case.  Given this import, the Court is hesitant to limit Plaintiff's discovery to only a handful of these employees,

21

which could run the risk of "overlooking individuals who might serve as plausible comparators, or discovery that could inform whether an accommodation imposed an undue burden" on Defendant. *Cox*, 2024 WL 1403074, at *6.

Still, Defendant's concerns about time and expense of responding to these detailed requests for 414 people have merit. What's more, Defendant is correct in noting that the primary case on which Plaintiff relies, *Cox v. Gray Media Group Inc.*, allowed much less burdensome discovery for a smaller group of employees. *See Cox*, 2024 WL 1403074, at *5 (allowing individual discovery for 68 individuals and noting that "the production of documents for each individual would amount to 3–4 e-mails, at most. In other words, the burden on [the employer] concerns the production of 200–300 pages, at most."). To be sure, the Court does not view *Cox* as the end-all-be-all for "how many" or "how much"—those kinds of determinations must be made on a case-by-case basis. But the parties must work together to ensure that Plaintiff's discovery requests are not overly burdensome. As such, the parties are **ORDERED** to confer on this request and compromise on ways to narrow its scope.

*** *

The Court acknowledges that the ongoing discovery disputes have made the case schedule impracticable. For this reason, the Court **STAYS** all discovery deadlines.

As a final note, it seems that many of these discovery disputes could have been resolved or narrowed with more effort from the parties. The parties are **REMINDED** of their obligation to collaborate and exhaust among themselves all extrajudicial means for resolving their differences. S.D. Ohio Civ. R. 37.1. Going forward, the Court expects the parties to confer in good faith with the common goal of reaching an extrajudicial resolution. The Court will not hesitate to shift fees should it be required to resolve future discovery disputes.

22

IV.     **CONCLUSION**

For the foregoing reasons, Defendant's Motion to Compel (Doc. 35), is **GRANTED in part and DENIED in part** as follows:

- o   The Court **ORDERS** Plaintiff to respond to Interrogatory No. 6. The Court **LIMITS** Plaintiff's answer to identifying any vaccinations, including but not limited to the COVID-19 vaccine and any vaccinations for influenza, shingles, hepatitis, HPV, Tdap or DTaP (including tetanus, diphtheria, and whooping cough), DT or Td (including tetanus and/or diphtheria), RSV, or any other condition, that Stone has received as an adult (i.e., since turning the age of 18), including (a) the type of vaccine; (b) the date it was administered; and (c) whether the vaccination was a requirement for employment;

- o   The Court **ORDERS** Plaintiff to respond to Interrogatory No. 24. The Court **LIMITS** Plaintiff's answer to identifying each and every medication, vaccine, food item, cosmetic product, or other products that Stone has rejected since turning the age of 18 years old because of her religious beliefs alleged in the Complaint (Doc. 14 at ¶ 14), and in the accommodation requests she submitted to Defendant (*id.* at ¶¶ 29, 33); and

- o   The Court **ORDERS** the parties to meaningfully confer on the scope of Request for Production No. 62 and method of production of Request for Production Nos. 7 and 62.

For the foregoing reasons, Plaintiff's Motion to Compel (Doc. 36), is **DENIED in part** as follows:

- •   The Court **ORDERS** the parties to negotiate further search terms and/or custodians relevant to Interrogatory No. 9 and Request for Production No. 42;

- •   The Court **DENIES without prejudice** Plaintiff's request regarding Defendant's litigation hold communications, but **ORDERS** the parties to confer further on discovery related to Stone's email account and Request for Production Nos. 6, 13, and 23;

- •   The Court **ORDERS** the parties to meaningfully confer on the discovery at issue in Interrogatory No. 10; and

- •   The Court **ORDERS** the parties to confer on the scope of Interrogatory Nos. 2 and 7 and Request for Production Nos. 19 and 39.

The Court also **HOLDS in ABEYANCE** the portions of the parties' Motions that require further conference. The conference(s) should be completed in-person or over the phone. As part of these conversations, the parties should also mutually agree on dates by which they will produce responses to the discovery requests ordered above.

23

The parties are further **ORDERED** to file two joint status reports detailing the progress they have made.  The first is due **April 17, 2025**, and the second is due **May 1, 2025**.  Should disputes still remain on May 1, the parties are **ORDERED** to either (1) certify that they have exhausted all extrajudicial means of resolving those disputes; or (2) ask for more time.  In the case of the former, the parties should also file position statements for the remaining disputes.

Lastly, the Court **STAYS** all discovery deadlines.  In their May 1 status report, the parties are **ORDERED** to also propose amended discovery deadlines.

IT IS SO ORDERED.


Date: April 10, 2025                    /s/Kimberly A. Jolson
                                        KIMBERLY A. JOLSON
                                        UNITED STATES MAGISTRATE JUDGE

24