IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | Civil Action No. 2:23-cv-3010 |
| | ) | Judge Michael H. Watson |
| Plaintiff, | ) | |
| v. | ) | Magistrate Judge Kimberly A. Jolson |
| | ) | |
| UNITED HEALTHCARE SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## THE EEOC'S  MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Jessi Isenhart
Trial Attorney
U.S. Equal Employment Opportunity Commission
Cleveland Field Office
1240 E. 9th Street, Suite 3001
Cleveland, OH 44199
Telephone: 216-306-1121
jessi.isenhart@eeoc.gov

June 8, 2025

<u>List of Deposition Transcripts and Exhibits</u>

<u>Deposition Transcripts</u>

The deposition transcripts cited herein are in the record as follows and are referred to by the last name of the deponent unless otherwise noted.

Doc. 81-2      Deposition of Amanda Stone

Doc. 81-3      Deposition of Sally Fischer

Doc. 81-5      Deposition of Kim Crandell

Doc. 81-6      Deposition of Katherine Schlaefer

Doc. 81-7      Deposition of Raynee Meyer

Doc. 81-8      Deposition of Jolene Tanner

Doc. 81-9      Deposition of Debra Gyoker

Doc. 81-10      Deposition of Rebecca Hoyt

<u>Exhibits</u>

The exhibits attached hereto are as follows.  Leading zeros in Bates numbers have been eliminated, and the prefix "UHG-STONE-" is abbreviated to "UHG."

Exhibit A      Concur Report – Amanda Stone (Stone Dep. Ex. 7)

Exhibit B      Telecommuting Policy-U.S. (UHG898-905) (EEOC Dep. Ex. 57)

Exhibit C      Declaration of Rebecca Hoyt (Hoyt Dep. Ex. 3)

Exhibit D      Job Profile: Supervisor Clinical Administration (EEOC311-312) (Stone Dep. Ex. 4)

Exhibit E      Level of Care Grid (EEOC Dep. Ex. 54)

Exhibit F      Oct. 6, 2021 Stone Request for Exemption (EEOC415-417) (Stone Dep. Ex. 21)

Exhibit G      Nov. 11, 2021 Stone Request for Exemption (EEOC418-420) (Stone Dep. Ex. 24)

Exhibit H      COVID-19 Vaccination Enterprise Policy (UHG787-799) (EEOC Dep. Ex. 3)

Exhibit I      Oct. 5, 2021 Announcement (EEOC353-356) (EEOC Dep. Ex. 2)

Exhibit J       Oct. 4, 2021 COVID-19 Vaccine FAQ (UHG298-312) (EEOC Dep. Ex. 41)

Exhibit K       Oct. 26, 2021 Stone Exemption Denial (EEOC302) (Stone Dep. Ex. 22)

Exhibit L       Nov. 24, 2021 Stone Exemption Denial (EEOC421) (Stone Dep. Ex. 25)

Exhibit M       Nov. 30, 2021 Stone Administrative Leave Notification (EEOC309-310) (Stone Dep. Ex. 28)

Exhibit N       Jan. 10, 2022 Stone Termination Letter (UHG1451-1452) (Stone Dep. Ex. 29)

Exhibit O       Oct. 28, 2021 Fischer-Gyoker Chat (UHG26783-26785) (EEOC Dep. Ex. 48)

Exhibit P       Bowers Exemption Granted Email (EEOC325-326)

Exhibit Q       Nov. 23, 2021 Fischer Email  Re: "CHW position" (EEOC321) (EEOC Dep. Ex. 45)

Exhibit R       Def's Supplemental and Amended Answers to EEOC's First Set of Interrogatories and Verification of Raynee Meyer

Exhibit S       Nov. 24, 2021 Gyoker-Stone Chat (UHG26776-26778) (EEOC Dep. Ex. 78)

Exhibit T       Emails regarding CM exemption (UHG31560-31562, UHG31614-31617)

Exhibit U       Def's Answers to EEOC's First Set of Interrogatories (EEOC Dep. Ex. 33)

Exhibit V       Employee List (Re-UHG-STONE-22718)

Exhibit W       Stone Resume (EEOC605-606) (Stone Dep. Ex. 1)

Exhibit X       Oct. 28, 2021 Email Re: Exemption/Accommodation templates (UHG1092-1093)

Exhibit Y       MedicalExemption_AccommodationAvailable.pdf (UHG1094)

Exhibit Z       MedicalExemption_AccommodationsNotAvailable.pdf (UHG1095)

Exhibit AA      ReligiousExemption_AccommodationApproved.pdf (UHG1096)

Exhibit BB      ReligiousExemption_AccommodationDenied.pdf (UHG1097)

Exhibit CC      Isenhart Declaration

For the reasons set forth below, the Court must deny UHC's motion for summary judgment.

## I. STATEMENT OF FACTS

**A. Amanda Stone's Employment with UHC.**

1. Amanda Stone began employment with UHC in 2014 as a Community Health Worker ("CHW"). CHWs were responsible for completing telephone and in-person contacts with the "members" UHC served in its Ohio Medicare-Medicaid Plan ("MMP") and Medicaid plan. CHWs' in-person contacts generally occurred in members' homes and were referred to as "field visits." Stone 43:10-46:25, 48:7-12, 78:10-12, 81:16-22, Fischer 10:25-14:22, 28:9-11.

2. In February 2016, Stone was promoted to Supervisor of Clinical Administration ("SCA") for MMP. As an SCA, she managed 20-23 CHWs. She was responsible for making sure her team of CHWs complied with contract requirements for the MMP, including making sure they conducted assessments, field visits, and telephonic communications within the required timeframes. Stone 63:6-64:3, 67:16-68:21; Fischer 13:15-14:22; Crandell 28:11-29:1.

3. Stone and one other SCA supervised all of the MMP CHWs. When Stone's first counterpart left the role, Stone helped interview candidates for it in November, 2018. The role was filled by Rebecca Hoyt at that time, who also took on a team of about 20 CHWs. Hoyt was a CHW before that. Stone 54:11-17, 67:16-68:21, 93:24-94:5, 105:19-106:15, 321:9-322:2; Ex. A (pp. 3 and 4, 7th row under the headings, transaction date Nov. 29, 2018); Hoyt 28:7-11, 42:14-43:2.

4. In March, 2020, Debra Gyoker became Stone and Hoyt's supervisor. In July, 2021, Sally Fischer became Vice President of Clinical Operations and Care Management, overseeing care management for the Ohio MMP and Ohio Medicaid plan, together called Ohio Community & State ("C&S"). Fischer was Gyoker's supervisor. Fischer 10:15-14:19; Gyoker 14:21-15:14.

5. CHWs generally were classified in UHC's system as field-based, which meant they

1

"went out into the field and saw members." Crandell 66:5-67:8, 71:17-19, 74:1-75:13, 76:12-21.

6. As an SCA, Stone was not a field-based employee; she worked from home and was classified as a telecommuter, including in Fall, 2021. Tanner 42:22-43:4, 49:22-50:17, 58:10-59:3, 61:6-14, 65:13-16; Crandell 78:23-79:5; Ex. B at UHG899; Stone 232:8-9, 260:2-6; Ex. C ¶¶ 6-7; Hoyt 65:9-12, 116:22-118:12.

7. The SCA job description did not say the job required any field visits or other in-person contacts. It stated the SCA would work via computer and/or calls. Stone 65:11-16; Ex. D.

8. UHC summarized MMP contract requirements for member care in a Level of Care ("LOC") grid, which shows that CHWs and RN Case Managers ("CMs," also called "HSS clinical coordinator RNs") were responsible for field visits. CMs had to be nurses and had to be overseen by nurses. CMs were responsible for "waiver members," who got services beyond what Medicaid and Medicare usually covered, and more intensive members living in the community ("community well members"). CHWs were responsible for less intensive community well members. In the LOC grid, SCAs do not have any responsibility for field visits or other required member contacts. Crandell 25:22-26:22, 39:3-62:6; Doc. 81-24; Ex. E; Fischer 10:15-23:1, 67:8-10; 134:11-16.

9. At the beginning of Stone's employment in the SCA position, Stone sometimes went into the field with CHWs to evaluate their performance, but any responsibility for field-based evaluation (also called ride-alongs) was removed from SCAs by 2018 and shifted to CHWs, who conducted the evaluations on a peer-to-peer basis. Stone 69:19-25, 77:13-17, 83:4-12, 84:16-85:8.

10. Accordingly, UHC's records reflect that the last time Stone performed a field-based evaluation was in December, 2017. Stone 70:16-71:1; Ex. A (pp. 1 and 2, first row).

11. SCAs were not required to go on field visits with new CHWs to train them. SCAs conducted virtual training for new hires. Other CHWs trained new CHWs in the field. Before the

2

COVID-19 pandemic, Stone occasionally stepped in to do field-based training when a CHW was not available locally to do it, but she had the authority to send a non-local CHW to conduct the training. Stone 55:19-22, 88:8-89:25, 317:1-318:2; Hoyt 55:5-57:3; Ex. C ¶ 10.

12. SCAs were not required to cover field visits for CHWs who were absent. Generally, such field visits could be rescheduled. If there was an urgent need for the visit, it was covered by another CHW. Fischer 101:20-102:4, 131:25-132:17; Crandell 32:14-19.

13. SCAs were not required to accompany CHWs with safety concerns in the field. If there were safety concerns relating to field visits, CHWs accompanied each other. Crandell 31:14-22, 32:14-19; Gyoker 24:23-25:21; Stone 55:19-56:6, 83:14-84:3.

14. SCAs were not required to go into the field with CHWs upon request. If a CHW asked for help in the field, Stone had the authority to send another CHW to help. Stone 122:23-123:6. When Hoyt was an SCA, no CHW ever asked her to go into the field with them. Hoyt 71:9-12.

15. SCAs did not go on field visits to resolve member complaints or at the request of members. Crandell 32:14-19; Gyoker 24:23-25:21; Hoyt 131:4-132:3, 133:12-15; Ex. C ¶ 11.

16. UHC's records show the last time Stone conducted a field visit was August 3, 2018. In the year prior to and including that date, Stone conducted only one other field visit, the December 2017 evaluation. Stone 70:16-71:1; Ex. A (pp. 1 and 2, 1st and 40th rows).

17. Rebecca Hoyt did not conduct any field visits after she became an SCA at or around the end of 2018. Hoyt 176:2-177:9, 182:3-183:19; Stone 105:19-106:15; Ex. A (pp. 3 and 4, 7th row under the headings, transaction date Nov. 29, 2018). She estimated that prior to the pandemic, 90% of her work was done from home. Hoyt 20:12-21:8, 64:22-66:15.

18. After Stone's last field visit in 2018, a minimal portion of her work involved travel with possible in-person contacts (only 37 days in the 19 months between August 4, 2018 and March 2,

3

2020), consisting of the activities set forth below in paragraphs 20-24. Ex. A.

19. Prior to the pandemic, Stone occasionally attended in-person Member Advisory Committee (MAC) meetings, where members were present. She was not required to attend them. They were staffed on a voluntary basis, and UHC "never had any trouble getting people to volunteer to come." Fischer 62:11-63:10; Stone 96:21-97:2, 133:11-24, 318:22-320:22.

20. Prior to the pandemic, Stone attended Area Agency on Aging ("AAA") meetings in person. All MMP employees were required to attend for mandatory training. Stone had no job duties at the meetings. If an employee was unable to attend a AAA meeting, the employee could fulfill the training requirement by reviewing the PowerPoint slides and receiving training from their manager. When trainings were recorded, an employee who was unable to attend also had the option of calling in and listening to it live or listening to a recording of it to fulfill the requirement. Gyoker 32:24-34:14, 35:11-16, 93:3-94:25; Stone 61:3-24, 314:24-315:20; Ex. C ¶ 15.

21. Prior to the pandemic, Stone occasionally participated in multi-day Ohio Department of Medicaid audits in-person in Dublin (near Columbus), Ohio. Shortly after the pandemic began, for reasons unrelated to the pandemic, there was no longer any opportunity for her to participate in the audits because the auditing agency no longer required audits of CHW work. Fischer 18:16-20:3, 53:9-54:14; Stone 35:18-36:4, 78:15-81:12, 102:11-103:15, 111:23-112:3.

22. Prior to the pandemic, Stone and Hoyt held regular staff meetings and attended regular management meetings virtually. They gave training at the virtual staff meetings. Infrequently, they held staff meetings in person, but they were not required to do so. They also occasionally went to in-person manager meetings. All meetings were virtual once the pandemic began. Stone 82:15-83:3, 318:5-11; Hoyt 57:10-59:6, 137:2-138:9, 139:5-140:11, 151:20-152:9; Gyoker 45:10-13.

23. Prior to the pandemic, Stone interviewed CHW candidates both virtually and in-person.

4

She was not required to conduct interviews in person. Stone 320:23-322:2.

24. SCAs were not required to give staff evaluations in person. Gyoker 45:14-46:12.

25. In March 2020, face-to-face member contact requirements were suspended due to the pandemic; CHWs and CMs could use telephone/video conferencing instead. Crandell 35:22-37:20.

26. Throughout the pandemic, Stone and Hoyt performed their SCA jobs completely from home with no in-person contact. Stone 91:24-92:2; Hoyt 67:21-68:4, 71:22-72:12, 80:20-82:6.

**B. Stone's Religion** (All transcript citations in this section are to Stone's deposition.)

27. Stone is a Catholic Christian. 186:13-15.

28. She believes in God, that Christ is the son of God, the Virgin Mary, the Holy Trinity, the Catholic Church, and life after death. 186:16-187:3, 190:12-16, 241:20-25, 404:14-18.

29. She looks to the Bible for what her religion teaches and guidance. Sometimes she has to interpret its meaning and application for life. 197:1-5, 240:17-24, 436:7-438:1.

30. She believes life begins at conception; humans are made in God's image with Christ as the template; and human life is sacred. 241:20-25, 329:6-16, 405:4-6, 429:2-11; Exs. F, G.

31. Stone believes violating the Commandments set forth in the Bible is a major sin, including the Commandment, "You shall not murder," at Exodus 20:13. 386:2-20; Ex. G.

32. She believes abortion violates that Commandment. 200:2, 422:13-24; Ex. G.

33. She believes violating the Commandments has negative consequences in this life and after death and that she can confess her sins and mitigate these consequences and then must try to live the best she can. 206:25-207:6, 384:25-386:7, 408:21-409:21, 467:21-468:6, 480:10-481:3.

34. Stone believes her body is a temple that she should not bring evil into, based on 1 Corinthians 3:16-17 ("Don't you know that you yourselves are God's temple and that God's Spirit dwells in your midst?  If anyone destroys God's temple, God will destroy that person; for God's

5

temple is sacred, and you together are that temple."). 187:19-188:6, 328:25-329:16; Ex. G.

35. While Stone has identified as a Catholic all her life, for a period beginning in childhood until early adulthood, she was not practicing her religion. During that period, in the late 1990s, when she was 18 years old, Stone had an abortion. Religion did not factor into her decision. Stone later returned to her faith and came to deeply regret having an abortion. 365:24-367:11, 368:4-6, 368:25-369:15, 370:24-371:13, 375:1-8, 382:14-23, 390:22-391:20, 408:18-25.

36. As Stone returned to faith, she wanted to have a child but struggled with repeated miscarriages. In October 2016, she suffered a devastating miscarriage in her second trimester. By then, she had learned the baby's sex and picked out a name. She delivered her deceased son and held him in her hands. 390:22-391:15, 400:15-402:24, 404:19-405:3, 407:17-408:4, 419:7-12.

37. The father of Stone's deceased son was not her husband. At the time she conceived her son, Stone and her now ex-husband were separated and planning to get divorced. She does not believe that was adultery. 410:4-14, 410:23-411:9, 411:21-412:6, 445:21-446:3.

38. The October 2016 miscarriage was a major turning point in Stone's faith. It moved her to return with deep devotion to her faith. 187:13-18, 331:8-22; 341:2-13, 357:1-8; 390:3-391:1, 391:25-392:23, 408:18-409:10, 428:25-429:22, 433:5-20.

39. Stone goes to church services several times a year, takes Communion, observes Catholic holidays and seasons, prays for help with daily life and difficult times, and prays the Rosary and reads devotional books that quote the Bible at least several times a week. 187:4-10, 189:15-190:17, 191:17-19, 195:9-198:8, 282:7-17, 329:6-16, 329:17-331:10, 392:20-23.

40. Around the end of 2020, Stone learned that the COVID vaccines were made or developed with fetal cell lines derived from abortions. 159:2-160:6, 161:15-22, 162:6-22.

41. Before hearing of the use of aborted fetal cell lines in making or developing the COVID

6

vaccines, it had not occurred to Stone that anything would be made using them. 159:2-160:6.

42. She believes that because the COVID vaccines were made or developed using aborted fetal cell lines, if she were to get such a vaccine, she would be bringing evil into her bodily temple, making the evil part of her, and condoning abortion in violation of the Commandments. 192:9-20, 199:12-200:13, 242:1-12, 341:2-13, 409:11-14, 415:21-416:18, 434:22-435:10; Exs. F, G.

43. Stone prayed on her decision about COVID vaccination. 433:5-434:7; Ex. G.

44. Due to her religious beliefs, Stone did not get a COVID vaccine. 210:15-17; 433:5-11.

45. After Stone learned about the use of aborted fetal cell lines in making or developing the COVID vaccines, including in 2021, she researched whether other medications she took were developed using aborted fetal cell lines. In doing so, she came to believe Tylenol and omeprazole were developed using aborted fetal cell lines, and she stopped taking them. She stopped taking omeprazole in 2021.[1] 160:23-161:14, 224:9-23, 478:17-479:5, 484:5-485:20; Exs. F, G.

46. Because of her belief that her body is a temple, Stone also believes she should try to quit smoking and avoid highly processed foods. However, she believes consuming things that are unhealthy is not as serious a sin as bringing evil into her body by taking a vaccine made or developed using fetal cell lines derived from abortion. She struggles to quit smoking. Stone 192:2-20, 192:14-17, 193:8-22, 206:3-12, 327:2-328:6, 341:2-342:3, 448:5-449:21, 465:14-467:16.

47. Stone does not believe cigarettes were developed using aborted fetal cell lines. During Stone's first deposition, after noting Stone has used nicotine replacement products, UHC's counsel claimed that nicotine has been "tested with fetal cells" and challenged Stone to research it. Stone later researched nicotine gum and did not find it was "tested" using fetal cell lines. It didn't occur

---

[1] During her first deposition, Stone confused omeprazole and the medication she replaced it with and mistakenly testified that she continued taking omeprazole after she was fired from UHC. She later corrected her testimony. Stone 288:3-20, 503:21-506:25.

7

to her to research cigarettes. 327:2-328:6, 341:21-342:3, 344:3-345:7; 453:10- 455:14.

48. As of her last deposition, Stone was continuing to research about products developed using aborted fetal cell lines and had stopped consuming products upon coming to believe that they were so developed. She had not researched every food she eats because that would be very time consuming and it did not make sense to her to research something she had no reason to believe may have been developed or produced using aborted fetal cell lines. For example, it had not occurred to her that a whole food like a tomato or lettuce might have been made available to her due to reliance on aborted fetal cell lines. 436:7-437:10, 489:1-4, 489:22-490:17, 491:7-493:23.

**C. UHC's vaccine mandate.**

49. In October, 2021, UHC put into effect a COVID-19 policy that stated certain categories of employees were required to get vaccinated against COVID-19 by November 30, 2021 (the "vaccine mandate" or "mandate"). The vaccine mandate did not apply if the employee got a medical or religious exemption. Schlaefer 23:16-19, 28:10-29:2; Ex. H at UHG789-791, 798.

50. The mandate was announced to employees on October 5, 2021, in a message intended to describe the mandate in plain language. It said employees were required to get vaccinated if they: (1) "Provide in-person care to our patients whether in one of our facilities or in an at-home setting;" (2) "Meet face-to-face with customers, members, providers or suppliers;" or (3) "Enter our facilities (whether on a full-time, part-time or occasional basis)." It also said the mandate did not apply to "full-time telecommuters who always performed their work remotely prior to the pandemic and those employees who have performed their work remotely since the pandemic began and have not entered one of our facilities." Schlaefer 31:14-33:1, Ex. I at EEOC354.

51. An October 4, 2021 FAQ described the mandate's scope the same way. It also stated that "[n]early all medical and religious accommodations are temporary" and may no longer be

8

available as business needs evolved. Fischer 93:18-94:15, Ex. J at UHG298-299, 302.

**D. Stone's religious exemption requests, denials, and termination.**

52. Stone submitted requests for a religious exemption from the mandate on October 6 and November 11, 2021. In both, she stated her beliefs that human life is sacred and a gift from God and explained that because the COVID vaccines used aborted fetal cell lines in their development, vaccination would violate her religious beliefs. In her second request, she added that she is a Christian and believes abortion is wrong, and she quoted the Bible. On October 26 and November 24, without follow-up about Stone's beliefs, UHC denied the requests. The denial emails included a paragraph about the urgency of vaccination and warned that UHC was "actively searching for and filling our staffing needs with vaccinated individuals" and "you may be replaced at any time." Stone 225:12-15, 228:15-16, 239:1-242:12, 244:13-16; Doc 14. ¶ 33; Exs. F, G, K, L.

53. Fischer made the C&S Ohio exemption decisions, including the decision to deny Stone's requests. She decided Stone's second request on November 17, 2021, at a time when MMP CHWs had not started to return to the field yet. Fischer 95:13-20, 97:10-98:3, 100:2-7, 112:10-118:1; Tanner 140:18-25, 145:3-9; Hoyt 116:5-11, 162:6-164:5.

54. Human capital partner manager Jolene Tanner notified Fischer of the requests and asked her questions, including whether Stone managed telecommuter or field-based staff and whether she was required to meet in person. Fischer never answered those questions. Instead, she asked whether Stone or the others were "short term exemptions, i.e., for medical reasons." When Tanner told her none had expiration dates, she responded, "Then the answer would be no for all…." Fischer 95:13-20, 97:10-98:2, 112:10-118:1; Tanner 14:9-25, 149:3-6, 151:7-20.

55. According to Fischer, she denied Stone's requests because "there was no short term end date for the accommodation," and "there were too many unknowns." She states she was concerned

9

that she didn't know how long the vaccine mandate might be in effect, that Stone might be needed in the field once her staff started going into the field again, and that UHC might not "have people who can go out into the field and resume these field visits" and so might not meet its "contractual obligations." There were no other unknowns she was concerned about. Fischer 98:3-100:1.

56. In deciding to deny Stone's exemption requests, Fischer did not consider or look into when the last time was that Stone had been required to go into the field. She did not review any documents or speak to Stone about any potential accommodations and did not recall speaking to anyone else to help her determine whether she could accommodate Stone. Fischer 100:8-101:16.

57. Stone was put on unpaid administrative leave on December 3, 2021, then fired effective January 8, 2022, for failure to comply with the mandate. Stone 265:1-9, 267:3-16; Exs. M, N.

**E. Other UHC exemption requests and accommodations.**

58. In October, 2021, Fischer decided to change an office employee to "telecommuter" so she wouldn't have to get vaccinated. In notifying the employee's supervisor, Fischer said she would not be able to enter a UHC office anymore, including for meetings. Fischer also confirmed she would not deny exemptions due to the need to staff MAC meetings. Fischer 84:5-93:3.

59. On October 28, 2021, Fischer decided to change CHW Pamela Bowers' designation in UHC's system to telecommuter so Bowers would not have to get vaccinated. Bowers was one of just two CHWs who only made phone calls (called "waiver touchpoint") and did not have face-to-face member contacts. Bowers and the other waiver touchpoint CHW were required to attend AAA meetings. Fischer 135:11-20, 136:17-139:8; Gyoker 80:17-83:10, 90:20-92:8; Ex. O.

60. Bowers' religious exemption was approved November 2, 2021. Like Stone's denial emails, the approval email expounded the urgency of vaccination and warned of being "replaced at any time." It also said, "we again encourage you to get vaccinated for COVID-19." Ex. P.

10

61. The emails communicating accommodation approvals and denials to UHC employees were based on templates. The religious accommodation emails had the language found in Stone and Bowers' respective denials and approval, but the medical accommodation emails did not mention the urgency of vaccination, warn about being "replaced at any time," or "encourage" or otherwise pressure the employee to get vaccinated. Exs. X, Y, Z, AA, BB, CC.

62. In November, 2021, the other waiver touchpoint CHW resigned and Fischer asked Stone to fill the position with Melissa Davis, a CHW from the Medicaid plan, because Davis had "medical reasons for not wanting to get the vaccine." The transfer was complete on December 23, 2021. Fischer 105:7-12, 121:6-122:23; 129:13-131:24; Gyoker 82:14-83:12, Ex. Q.

63. On November 24, 2021, Stone asked Gyoker how waiver touchpoint CHWs could get exemptions when they would have to attend AAA meetings. Gyoker told Stone they could call in to the AAA meetings or receive the training from their manager. Gyoker 90:20-94:25; Ex. S.

64. In November, 2021, Fischer and Tanner approved a temporary exemption for a field-based CM. They knew then there was no real end date for the CM's need for exemption, as the CM planned never to get vaccinated. They approved the exemption anyway because Fischer and Gyoker thought it better to have a field-based employee who couldn't go into the field but could do other work than to have one less employee. Ex. T.

65. From October 1, 2021 to January 8, 2022, only three CHWs in the MMP requested religious exemptions (Meyer 101:10-102:12; Ex. U pp. 5, 6-7) and only two CHWs in all of C&S Ohio requested medical exemptions (Ex. R pp. 9, 28-29). The two CHWs who requested medical exemptions, employees 1327759 and 1282983, were not on an MMP team. Ex. R pp. 9, 28-29; Ex. V at rows 35 and 92, columns G and I (reflecting that 1327759 and 1282983 were not on Stone or Hoyt's teams). Of the CHWs who sought religious exemptions, two had been denied by October

11

26, 2021. The sole approval was Bowers. Ex. U pp. 5, 6-7.

66. In that period, in C&S Ohio, UHC approved 5 out of 6 medical exemptions, including for CHWs and CMs, but approved only 2 religious exemptions out of 25. Ex. R pp. 9, 24-29.

## II. ARGUMENT

### A. There are genuine disputes of material fact regarding UHC's undue hardship defense.

The Court must deny UHC's motion for summary judgment on undue hardship because there is evidence that UHC could have exempted Stone from vaccination and allowed her to refrain from in-person contact in her job without substantial increased costs in relation to the conduct of UHC's business. *Groff v. DeJoy*, 600 U.S. 447, 470-471 (2023). Her normal job duties did not include in-person contacts. UHC has the burden to prove it could not accommodate her religious beliefs without undue hardship. *Smith v. Pyro Mining*, 827 F.2d 1081, 1085 (6th Cir. 1987).

UHC argues that exempting Stone would have created safety risks because Stone had to perform and be ready to perform in-person and field-based functions with vulnerable populations, but the evidence shows the SCA job did not require any such thing. Stone testified that accompanying CHWs in the field had not been one of her job duties since early in her tenure. SOF ¶ 9. Testimony by Stone, Hoyt, and UHC management also reflects that SCAs were not required to train or assist CHWs in the field, even if Stone had occasionally done so as a matter of convenience. SOF ¶¶ 11, 13-15. Accordingly, UHC's records show that Stone had not evaluated a CHW in a field visit since 2017, and had only been on a field visit once since then, in August, 2018. SOF ¶¶ 10, 16. The SCA job description also does not say the SCA had to do any field-based work. SOF ¶ 7. As for attending MAC meetings, the undisputed evidence is that they were staffed on a voluntary basis and that Fischer did not consider the need to staff them a factor that would make exempting an employee from the mandate an undue hardship. SOF ¶¶ 19, 58. This is

12

all consistent with Stone's classification as a telecommuter. SOF ¶ 6. As a telecommuter, she was not supposed to be subject to the mandate in the first place, which could lead a reasonable jury to conclude it would not have been an undue hardship to exempt her. SOF ¶¶ 49-51.

Further, while UHC claims Stone had to be able to cover CHW duties on an unpredictable basis, a reasonable jury could reach a different conclusion based on the evidence. The SCA job description did not say stepping in to do CHWs' jobs was one of the responsibilities of the position. SOF ¶ 7. UHC relies on manager testimony that the job description did require this, in language about being "accountable for the daily activities of business support, technical or production team or unit." Def's SOF, Doc. 81-1 ¶ 39 and testimony cited therein. However, that is not the plain meaning of the language. An SCA is accountable for the daily activities of CHWs by making sure *the CHWs* complete their required member contacts, making sure that when a CHW is absent, their appointments are rescheduled or covered by other CHWs, and making sure CHWs in need of assistance in the field get help from other CHWs. SOF ¶¶ 2, 12-14. Testimony from Stone, Hoyt, and UHC managers, and UHC records show this is how things actually worked. SOF ¶¶ 2, 12-17.

Fischer's claim that managers had to cover for staffing shortages in the Fall of 2024 cannot be used to show that CHWs had to be able to cover CHW duties three years earlier. The staffing shortages Fischer testified about were CM shortages, not CHWs. Fischer 16:12-17:2, 41:11-17; 132:21-133:22; SOF ¶ 8. Moreover, the undue hardship analysis is limited to consideration of the situation that existed at the time. *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1380 (6th Cir. 2024); *see also Henry v. S. Ohio Med. Ctr.*, 155 F.4th 620, 632 (6th Cir. 2025) ( "an employer is permitted to draw conclusions based on evidence and information that was available at the time").

UHC's contention that Stone's job required in-person contact with CHWs or other non-members is equally unavailing. First, that's not why Fischer denied the exemption. Her asserted

13

reason was entirely about availability to go into the field; she confirmed she had no other concerns. SOF ¶¶ 53, 55. In fact, keeping unvaccinated employees away from members, patients, customers, providers, and suppliers and out of UHC facilities was the goal of the vaccine mandate. SOF ¶¶ 50-51. Any in-person staff meetings and training could continue to be avoided without undue hardship and were excused to give exemptions. SOF ¶¶ 58-60, 62-63.

Further, the record evidence shows that in-person contact with CHWs or other non-members was not an SCA job duty. It is not listed in the job description as a duty. SOF ¶ 7. Stone, Hoyt, and UHC's manager testified that meetings and staff evaluations did not have to be conducted in person. SOF ¶¶ 22, 24. The audits Stone participated in before the pandemic no longer required SCA attendance because they simply weren't auditing CHWs' work anymore. SOF ¶ 21. AAA training could be made up the way it always had been. SOF ¶¶ 20, 59-60, 62-63. Also, to the extent that making up the AAA training would have been an accommodation, it was one that UHC could have borne without substantial increased costs for Stone, just as it did for Bowers and Davis. *Groff*, 600 U.S. at 470.

Given that Stone's job did not require in-person contact with members or CHWs working with them, UHC gets no support from decisions it cites that turn on risks to vulnerable populations (*Henry*; *Wise v. Children's Hosp. Med. Ctr. of Akron*; *Hall v. Sheppard Pratt Health Sys.*; *Kizer v. St. Jude Children's Rsch. Hosp.*; and *Aukamp-Corcoran v. Lancaster Gen. Hosp.*). Indeed, UHC's assertions about the difficulties of the pandemic and efficacy of the vaccines, Def's SOF ¶¶ 3-8, are not material in this case because UHC could have accommodated Stone by permitting her to refrain from in-person contact in her job. The EEOC also objects to UHC's "facts" that rely on Bolaris's report, Def's SOF ¶¶ 4-7, 15, 75. Bolaris' opinions are inadmissible. *See* Doc. 79.

Additionally, the Court does not have to accept UHC's undue hardship decisions just

because UHC says they were "safety judgments." In *Wise*, 2025 WL 1392209, the Court would not second guess a denial of a COVID-testing exemption, even though there was evidence the hospital's decisions about testing were inconsistent, because the hospital's decision-making was influenced by changing scientific recommendations, government rules and guidelines, and resources. Nothing in *Wise* or any decision UHC cites gives an employer *carte blanche* to make an undue hardship determination as Fischer did, without looking into the real facts of the situation. In the undue hardship analysis, "courts must apply the test in a manner that takes into account all relevant factors in the case at hand." *Groff*, 600 U.S. at 470-471. Fischer did nothing to ensure she knew what Stone's normal job duties were when she denied her requests, even though Fischer hadn't begun to oversee the MMP until the middle of the pandemic. SOF ¶¶ 4, 54, 56. A reasonable jury need not find that such haphazard decision-making supports an undue hardship determination.

A reasonable jury also could reject UHC's assertion that exempting Stone risked contractual non-compliance. UHC has produced no contract imposing field-based or other in-person requirements on SCAs, and the LOC grid placed the responsibilities for in-person contacts with members on the frontline CMs and CHWs, not SCAs. SOF ¶ 8. Further, Fischer's statements that she might have "one or two dozen people who could not go out and do field visits" if accommodations were approved (Fischer 99:15-21), and so she might not have enough people to resume contractually required field visits, seem not to reflect a genuine concern, given her contrary reasoning with regard to a CM who was seeking exemption at the same time. SOF ¶ 64. Moreover, Fischer's statements in this regard have no basis in fact. At the time Fischer denied Stone's second request, only three MMP CHWs[2] had requested exemption; UHC had already denied two of them; and only 13 days remained until the vaccination deadline. SOF ¶¶ 49, 53, 65. The one MMP CHW

---

[2] Stone couldn't have covered CM field visits. She wasn't a nurse. Stone 33:6-9, Ex. W; SOF ¶ 8.

15

granted an exemption was Bowers, who, like Stone, did not work in the field. SOF ¶¶ 59-60, 65. Nothing before Fischer indicated a looming MMP field staff shortage that could have left UHC on the "razor's edge of legal liability" if it had granted Stone an exemption. Further, any exemption granted could have been revisited if a staff shortage ever really was on the horizon. SOF ¶ 51.

**B. A reasonable jury can find Stone's beliefs are religious and conflicted with the mandate.**

The Court must reject UHC's attack on the EEOC's prima facie case. A reasonable jury could find from the evidence that Stone's beliefs are religious and conflicted with UHC's mandate.

Title VII protects "all aspects of religious observance and practice," 42 U.S.C. § 2000e(j). A belief is protected if it is "religious in the believer's own scheme of things," such that it "occupies a place in the life of its possessor parallel to that filled by … God." *United States v. Seeger*, 380 U.S. 163, 165-166, 176 (1960); *Kent v. Johnson*, 821 F.2d 1220, 1224-1225 (6th Cir. 1987). Religious beliefs need not be shared by all members of the sect with which the believer associates. *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 715-716 (1980). Courts may not question "the centrality of particular beliefs or practices to a faith," nor the believer's interpretation of those creeds. *Lucky v. Landmark Med. of Michigan, P.C.*, 103 F.4th 1241, 1243-1244 (6th Cir. 2024). Courts must not "presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." *Id.* Therefore, where a plaintiff alleges an employee's religious beliefs conflicted with a vaccine mandate, courts may not require her to explain how "her religion has a specific tenet or principle that does not permit her to be vaccinated." *Id.*; *Sturgill v. American Red Cross*, 114 F.4th 803, 810 (6th Cir. 2024). The Court therefore must reject UHC's argument that Stone has not identified a "specific religious tenet" that conflicts with the mandate. Further, Stone explained the tenets of her religion that make her reject the vaccines. SOF ¶¶ 30-34, 42.

Evidence of beliefs like Stone's is sufficient for a reasonable jury to find the beliefs are

16

religious. *Compare* SOF ¶¶ 27-34, 42-44 *with Benton v. BlueCross BlueShield of Tenn., Inc.*, 765 F. Supp. 3d 723, 731-732 (E.D. Tenn. Jan. 31, 2025) (plaintiff believes God created humans in his image, life begins at conception, God views abortion as murder, aborted fetal cell lines were used in the development or testing of the vaccines, her faith precluded her from getting the vaccine; she cited Bible passages); *Brown v. MGM Grand Casino*, No. 2:22-cv-12978, 2024 WL 4819575, at *5-6 (E.D. Mich. Nov. 18, 2024) (plaintiff believes life begins at conception, he would be held accountable by God if he took a vaccine made or tested using fetal cell lines); *Speer v. UCOR LLC*, No. 3:22-cv-426, 2024 WL 4370773, at *6-8 (E.D. Tenn. Oct. 1, 2024) ("opposition to vaccination based on purportedly religious concerns over abortion constitute beliefs that are religious on their face"); *see also Bobnar v. AstraZeneca Pharms. LP*, 758 F. Supp. 3d 690, 721 (N.D. Ohio 2024); *Lucky*, 103 F.4th at 1243-1244; *Sturgill*, 114 F.4th at 808.

Title VII does not protect "purely secular beliefs, such as those that are…the product of 'a merely personal moral code,'" *DeVore v. Univ. of Kentucky Bd. of Trs.*, 118 F.4th 839, 845 (6th Cir. 2024), but UHC's contention that Stone's beliefs fall into that category because she said "religion is a personal thing," interprets the Bible herself, and does not believe she has to follow all the rules of the Catholic Church is grossly wrong. *DeVore* involved a plaintiff who had drawn no connection between her belief and any religious principle and had not identified what her religion was. *DeVore* does not and cannot stand for any rule that calling religion "personal," interpreting scripture for oneself, or disagreeing with some of the rules of one's church excludes a person's beliefs from protection. *Seeger*, 380 U.S. at 165-166, 176, 183-184 (religion is "an intensely personal area"); *Lucky*, 103 F.4th at 1243-1244 (courts may not question believer's interpretation of the creeds in which she professes faith); *Thomas*, 450 U.S. at 715-716.

Nor does *DeVore* or any case UHC cites support its contentions that Stone's objections to

17

the vaccines are not religious because she had an abortion decades ago, had sex with someone else while separated from her now ex-husband, or struggles with nicotine addiction, or because UHC thinks she hasn't researched products she consumes enough. In arguing these, UHC asks the Court to find that Stone's objections must be merely personal rather than religious because Stone acted in ways UHC deems inconsistent with her religion. The Court must not do so. Beliefs need not be consistent to be protected, and *DeVore*'s holding was not based on inconsistency between conduct and beliefs. *DeVore*, 118 F.4th at 845-848, quoting *Thomas*, 450 U.S. at 714. *See also Sturgill*, 114 F.4th at 809-810 (plaintiff need not plead how receipt of a Hepatitis vaccine aligned with her religious beliefs); *Benton*, 765 F. Supp. 3d at 732 (plaintiff's receipt of and failure to research other vaccines did not preclude finding a sincerely held religious belief); *Speer*, 2024 WL 4370773, at *6 (plaintiff's testimony that he did not research whether his medication was developed using fetal cells and that he probably would keep taking it if he learned it was did not preclude finding a sincerely held religious belief). The Court also must reject UHC's invitation to judge incorrect Stone's interpretation of the Commandment against adultery. *Lucky*, 103 F.4th at 1243-1244.

Further, there is no evidence that Stone ever "learn[ed]" of a relationship between cigarettes and aborted fetal cell lines. SOF ¶ 47. In fact, there is no record evidence that cigarettes were developed in reliance on testing in fetal cell lines. *See* Doc 79, PAGEID # 1967-1969. Further, Stone admitted she struggles with nicotine addiction, but an employee does not lose protection for her beliefs merely because she is struggling to apply them. SOF ¶ 46; *Thomas*, 450 U.S. at 715. It also did not occur to Stone to research whether whole foods rely on the use of fetal cell lines, SOF ¶ 48, and there is no record evidence that they do. *See* Doc. 79, PAGEID # 1967-1969.

The Court also must decline to use the three-factor test from *Africa v. Pennsylvania*, 662 F.2d 1025 (3d Cir. 1981). The test was not devised for a case, as here, where the believer subscribes

18

to an established religion like Christianity. The Third Circuit articulated the test to "determine the existence of a religion" in a case where the petitioner belonged to a naturalist organization founded by his family. *Africa*, 662 F.2d at 1031; *see also Fallon v. Mercy Catholic Medical Center*, 877 F.3d 487 (3d Cir. 2017) (plaintiff did not belong to an organized religion). Moreover, in the 45 years since the *Africa* decision, the Sixth Circuit has never adopted *Africa*'s three-factor test. *See Bobnar*, 758 F. Supp. 3d at 719. This comports with the Sixth Circuit's First Amendment jurisprudence. The *Africa* test invites an inquiry into the centrality or validity of a person's beliefs that the Sixth Circuit forbids. *See Sturgill*, 114 F.4th at 809, 810; *Lucky*, 103 F.4th at 1243-1244; *Bobnar*, 758 F. Supp. 3d at 720. If this Court uses the *Africa* test, however, Stone's beliefs meet it. They address fundamental and ultimate questions in a comprehensive manner, covering the nature of God, the origin and nature of life, divine law regarding right and wrong, and what happens when we die. SOF ¶¶ 28-34, 42. Her beliefs are marked by formal and external signs. SOF ¶ 39.

**C. A reasonable jury could find that UHC discriminated against Stone because of religion.**

The Court also must deny UHC's motion as to the EEOC's disparate treatment claim. The EEOC need not show that similarly situated employees were treated better. The fourth element of a prima facie case is "circumstances that support an inference of discrimination," and fact disputes must be tried. *Willard v. Huntington Ford*, 952 F.3d 795, 807-808 (6th Cir. 2020). *Savel*, cited by UHC, does not say otherwise. *Savel v. MetroHealth Sys.* No. 24-4025, 2025 WL 1826674, at *3 (6th Cir. July 2, 2025). Here, UHC had animus against religious objectors and treated them worse than others. UHC treated those seeking medical exemptions with dignity. Their medical concerns were treated as non-negotiable, and they were not pressured to get vaccinated. SOF ¶ 61. Religious objectors were not afforded the same dignity. Their religious concerns were treated as if they could be disregarded if the stakes were high enough; they were pressured and threatened to violate their

19

convictions and get vaccinated, even when their exemptions were approved. SOF ¶¶ 52, 60, 61. Fischer's actions in deciding exemption requests were in keeping with this corporate animus. When presented with Stone's and others' requests, Fischer asked whether they were for medical reasons; Tanner revealed they were not; and Fischer denied them without further consideration. SOF ¶¶ 53-54, 56. Consistently, medical exemptions were granted and religious exemptions were denied, with medical versus religion making the difference. SOF ¶ 66. Such facts support an inference of discrimination. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998) (corporate culture of discrimination can raise an inference of discrimination).

Further, CHWs and CMs seeking medical exemptions were exempted and therefore treated better than Stone. These employees *were* similarly situated to Stone in all relevant respects because they were required to have the in-person contacts with members that UHC claims Stone had to be available to cover, and UHC considered all accommodations to be temporary. SOF ¶¶ 5, 8, 51, 66. *Ercegovich*, 154 F.3d at 353 (refusing to require comparators to be similarly situated in every aspect, lest employers have free reign to discriminate against employees in unique positions).

There also is evidence of pretext. Fischer's stated reason for denying Stone's exemption had no basis in fact and could be rejected by a reasonable jury. *Supra*, pp. 15-16. With the evidence of the EEOC's prima facie case, this could lead a reasonable jury to find intentional discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-147 (2000). Also, Stone did not admit that "her managers did not discriminate against her" or that "UHC did not treat her differently" because of religion, Def's SOF ¶ 61. The testimony UHC cites does not say that. Also, any such statements would not preclude a finding for the EEOC on disparate treatment. *EEOC v. Waffle House, Inc.*, 534 U.S. 279 (2002) (EEOC is not a mere proxy for those it seeks relief for).

For all of the foregoing reasons, UHC's motion for summary judgment must be denied.

20

Respectfully submitted,


*s/ Jessi Isenhart*
Jessi Isenhart
Trial Attorney
U.S. Equal Employment Opportunity Commission
Cleveland Field Office
1240 E. 9th Street, Suite 3001
Cleveland, OH 44199
Telephone: 216-306-1121
jessi.isenhart@eeoc.gov

Counsel for the EEOC


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing was filed by CM/ECF, this 8th day of June, 2026, with electronic notification to all counsel of record.


*s/ Jessi Isenhart*

21