**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) | |
| | ) | Civil Action No. 2:23-cv-3010 |
| Plaintiff, | ) | |
| v. | ) | Judge Michael H. Watson |
| | ) | |
| UNITED HEALTHCARE SERVICES, INC. | ) | Magistrate Judge Kimberly A. Jolson |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN REPLY TO PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.**     **There are No Genuine Issues of Material Fact That Would Prevent the Entry of Summary Judgment in Favor of UHC.**

The EEOC's Opposition fails to meaningfully address—or even respond to—UHC's Statement of Undisputed Material Facts as required by Rule 56(c). UHC's Undisputed Material Facts should therefore be "consider[ed]  . . . undisputed for purposes of [Defendant's] motion [for summary judgment]." Fed. R. Civ. P. 56(e)(2). *See McGrath v. Nationwide Mut. Ins. Co.*, 295 F. Supp. 3d 796, 807 (S.D. Ohio 2018) (plaintiff "has the obligation to identify specific facts that are in dispute that would preclude summary judgment") (citing Fed. R. Civ. P. 56(e)) (emphasis in original). The Sixth Circuit has noted "that there is no duty imposed upon the trial court to search the entire record to establish that it is bereft of a genuine issue of material fact." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992) (internal citations and quotations omitted). Here, the EEOC improperly asks the Court to do just that. The EEOC's "Statement of Facts," ECF No. 89, PAGEID #5873-5884, ¶¶1-66 (the "EEOC's SOF" or "Pl.'s SOF") is improper and provides no help to the Court in determining whether any facts are disputed: the EEOC fails to state whether its facts are disputed or undisputed, nor does the EEOC identify whether any of its facts respond to UHC's SOF.

UHC's Undisputed Material Facts contains 78 paragraphs of undisputed, material facts. Of those 78 paragraphs, 27 are *undisputed* because the EEOC wholly fails to address them *anywhere* in its Opposition. *See* Def.'s Motion for Summary Judgment, ECF No. 81-1, PAGEID #2801-2810 ("UHC's SOF" or "Def.'s SOF"), ¶¶ 1-2, 8, 10-14, 17,[1] 23-24, 28, 34, 36, 42-47, 54-57, 58-59, and 65. *See* Fed. R. Civ. P. 56(e). The EEOC addressed only part of Def.'s SOF ¶60

---

[1] The EEOC does not address Def.'s SOF ¶17. While it attempts to dispute the in-person requirements of Stone's job, the EEOC does not attempt to, nor can it, dispute UHC's management's *understanding* of the contract's requirements, which is the fact alleged in SOF ¶ 17.

(fails to address that Stone is unvaccinated against COVID-19). Additionally, 43 paragraphs of UHC's SOF are undisputed because they are either conceded by the EEOC, or the fact asserted in UHC's SOF is restated or incorporated in the EEOC's own SOF:

| Def.'s SOF Paragraph | *Compare With* Pl.'s SOF Paragraph | Def.'s SOF Paragraph | *Compare With* Pl.'s SOF Paragraph |
|---|---|---|---|
| 9 | 49 | 60 | 57 |
| 16, 18 | 8 | 62 | 27 |
| 19-22 | 1 | 63 | 35-36 |
| 25 | 2 | 64 | 29 |
| 26 | 2-3 | 66 | 45 |
| 29-30 | 9 | 67 | 34 |
| 31 | 10 | 68 | 35 |
| 32 | 20 | 69 | 30-32 |
| 33 | 19 | 70 | 31-32 |
| 35 | 23 | 71 | 45 |
| 37 | 27, 39 | 72 | 48 |
| 38 | 14 | 73 | 45 |
| 41 | 25-26 | 74 | 47 |
| 48-49 | 52 | 76 | 46 |
| 50 | 53-54 | 77 | 47 |
| 51-53 | 55 | 78 | 31, 37 |

**UHC's SOF ¶¶3-8.** Plaintiff claims that UHC's Paragraphs 3-8 are "not material in this case because UHC could have accommodated Stone by permitting her to refrain from in-person contact in her job," but the EEOC fails to respond in substance to those paragraphs. ECF No. 89, PAGEID #5886. The EEOC's opinion on materiality does not allow the agency to ignore Rule 56, and Paragraphs 3-8 should be deemed undisputed. *See* Fed. R. Civ. P. 56(e).

**UHC's SOF ¶¶4-7, 15, 75.** The EEOC objects to UHC's Paragraphs 4-7, 15, and 75 because it contends "Bolaris' opinions are inadmissible," citing its own Motion to Exclude. ECF No. 89, PAGEID #5886; ECF No. 79. First, the EEOC fails to dispute the content of Bolaris' report (because it cannot). ECF No. 89, PAGEID #5886. *See Nauroth v. S. Health Partners, Inc.*, 2009 WL 3063404, at *10 (S.D. Ohio 2009) ("rather than offering evidence to contradict the opinion of Dr. Miguel, Plaintiff effectively admitted Dr. Miguel's conclusions by failing to

2

respond to Defendant's statement of proposed undisputed facts"). Further, the EEOC ignores that Paragraphs 4-7 and 15 rely on other admissible evidence to establish these same facts. *See* Def.'s SOF ¶¶4-7 (citing to Bolaris report *and* deposition of Dr. Berke); and ¶15 (citing to Bolaris report *and* depositions of A. Stone and R. Meyer). The EEOC fails to respond to these Paragraphs which should be deemed undisputed. *See* Fed. R. Civ. P. 56(e).[2]

**UHC's SOF ¶¶27 and 39.** Even as the EEOC purports to dispute Stone's job required in-person functions, its own Facts demonstrate that the SCA position historically involved extensive in-person functions. The EEOC concedes that Stone "went into the field with CHWs to evaluate their performance" (Pl.'s SOF ¶9); "stepped in to do field-based training when a CHW was not available locally to do it" (Pl.'s SOF ¶11); "attended in-person Member Advisory Committee (MAC) meetings" (Pl.'s SOF ¶19); "attended Area Agency on Aging ('AAA') meetings in person" for "mandatory training" (Pl.'s SOF ¶20); held staff meetings in person and went to in-person manager meetings (Pl.'s SOF ¶22); and "interviewed CHW candidates both virtually and in-person" (Pl.'s SOF ¶23). Stone's Concur expense records—which she submitted for reimbursement and confirmed were accurate—document in-person work activities throughout her tenure including in the period before the pandemic in March 2020. Def.'s SOF ¶31-35.

The EEOC attempts to minimize each in-person function by characterizing them as optional, infrequent, or no longer applicable. But taken together, these undisputed facts paint a picture of a supervisory role that, under normal operating conditions, regularly involved in-person interaction with staff, members, and external stakeholders. The EEOC's own facts

---

[2] Paragraph 75 relies exclusively on Bolaris' report. *See* Def.'s SOF ¶75. But any dispute is not material. Even if the EEOC disputes that nicotine has been tested on the same fetal cell lines used to test certain COVID-19 vaccines, *id.*, it is undisputed that Stone smokes cigarettes, and has continued to smoke cigarettes for some time, even as she claims her "body is a temple." *See Id.*, ¶ 76; Pl.'s SOF ¶46.

confirm that the pandemic, not any deliberate restructuring of the SCA role, *temporarily* paused these in-person functions for health and safety reasons. The EEOC offers no response to the undisputed evidence that UHC was restoring those in-person functions to support members *at the very time Stone's exemption was being evaluated and her employment was terminated. See* Def.'s SOF ¶46. The EEOC cannot dispute testimony that SCAs "[had] to be able to perform the work that [her supervisee] CHWs were performing," Hoyt at 42:1-5, and Stone's concession that: "it wasn't that the supervisor had to do it, it had to get done. So as a supervisor if . . . there was no one else to do it, you just stepped up and did it because you were a supervisor." Stone at 89: 3-7.

UHC's SOF ¶40. It is undisputed that "in Fall 2024, Fischer had managers who had to take on a case load to cover for staffing shortages." Def.'s SOF ¶40. The EEOC argues that this "cannot be used to show that CHWs had to be able to cover CHW duties three years earlier" and "[t]he staffing shortages Fischer testified about were CM shortages, not CHWs." ECF No. 89, PAGEID #5885. In addition to not disputing UHC's SOF ¶40, the EEOC overlooks the key point that in the fall of 2021, UHC was preparing to return employees to the field and that its employees did, *in fact,* return to field work as Fischer testified. *See* Def.'s SOF ¶46.

UHC's SOF ¶61. The EEOC attempts to dispute UHC's Paragraph 61, by suggesting "Stone did not admit that 'her managers did not discriminate against her' or that UHC did not treat her differently' because of her religion" because "[t]he testimony UHC cites does not say that." ECF No. 89, PAGEID #5892. The EEOC is wrong; Stone's testimony is explicit and this Paragraph is undisputed. *See* Def.'s SOF ¶61.

The EEOC invokes the jury's role in resolving "fact disputes," ECF No. 89, PAGEID #5884, 5891, but identifies none. The only question remaining is legal: whether the undisputed record establishes that Stone's particular objection is religious in nature and actually conflicts

4

with the Vaccination Policy (the "Policy"), and whether it was an undue hardship for UHC to grant Stone's exemption request. *DeVore v. Univ. of Ky. Bd. of Trs.*, 118 F.4th 839, 848-849 (6th Cir. 2024). On this record, summary judgment should be granted to UHC.

**II.     The EEOC Fails to Address and So Concedes Many of UHC's Arguments on the Failure to Accommodate Claim.**

**A.     The EEOC Failed to Address the Undisputed Evidence That C&S Ohio Was Returning to In-Person Field Operations and Stone Was Required to Be Available to Go Into the Field and Manage Field-Based Staff.**

The EEOC is silent on the operational reality that drove UHC's accommodation analysis: at the time Stone's exemption requests were being evaluated in the fall of 2021, Community & State ("C&S") Ohio was actively preparing to return the in-person field operations that had been temporarily suspended during the COVID-19 pandemic, and Stone's managers determined that, post-pandemic, she needed to be available to manage her field-based staff in person, in the field. ECF No. 81-1, PAGEID #2813. The EEOC does not dispute this, nor can it. By failing to address this core argument, the EEOC has conceded it. *See Tonkovich v. Gulfport Energy Corp.*, 2012 WL 6728348, at *2 (S.D. Ohio 2012) ("refusal to address the substance of [certain arguments in] Defendant's [summary judgment] motion amounts to abandonment of the claims."); *Campbell v. Nally,* 2012 WL 4513722, at *11-12 (S.D. Ohio 2012) (perfunctory statement in opposition that "material facts remain in dispute" regarding certain claims equals abandonment of claims).

Instead of disputing this evidence, the EEOC spins a backward-looking narrative, cataloguing what Stone did years before the Policy and during the *temporary* suspension of normal operations caused by the pandemic, while ignoring the forward-looking and real operational crisis that UHC confronted when they evaluated Stone's requests. ECF No. 89, PAGEID #5884-5. The EEOC's approach cannot be squared with *Groff v. DeJoy*, which requires courts to assess undue hardship by examining whether a proposed accommodation would impose

"substantial increased costs in relation to the conduct of [the employer's] particular business," evaluating "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact." 600 U.S. 447, 470 (2023). By focusing narrowly on stale job circumstances from the lockdown era while disregarding the practical impact of the requested accommodation on UHC's ongoing business operations, the EEOC would improperly constrain the *Groff* analysis and ignore UHC's real-world demands during the relevant time period. This is especially true for a health care employer seeking to return to operational normalcy and bring critical care back to members in their homes after pandemic disruptions.

> **B.      The EEOC Fails to Address UHC's Expert-Driven Implementation of the Policy, the Safety Risks That Drove Its Creation, and the Fact That Reassigning Stone Would Have Imposed an Undue Hardship.**

The EEOC's Opposition leaves UHC's foundational arguments untouched. It does not (and cannot) dispute the multidisciplinary, expert-driven process that produced the Policy. Def.'s SOF ¶¶2-8; ECF No. 81-1, PAGEID #2811-12. It cannot dispute the emergent public health crisis, the vulnerability of UHC's members or that non-pharmaceutical interventions were inadequate. *Id.* And it concedes that no suitable reassignment for Stone existed at her level. ECF No. 81-1, PAGEID #2815. Each of these admissions supports summary judgment in UHC's favor.

> **III.    The EEOC's Attack on UHC's Business Judgments Lacks Support in the Record and Improperly Substitutes the EEOC's Own Judgment for UHC's.**

> **A.      The EEOC's Self-Serving Hindsight Judgments About Operational Impact Lack Support in the Record.**

The EEOC's argument relies on its self-serving, hindsight opinion that losing two or three CHWs (or an SCA like Stone who supervised 20 CHWs) would not have created operational burdens. The EEOC offers nothing to support that premise and the undisputed record shows the opposite. Stone conceded she and Hoyt each oversaw approximately 20 CHWs. Pl.'s SOF ¶3;

Fischer 18:4-15. Each CHW had a caseload of 500 members. Stone 92:17-24. Stone's counterpart, Hoyt, testified that "hiring [] takes an enormous amount of time" that the team did not realistically have, given its other duties. Hoyt 122:17-19. The notion that the potential loss of even a small number of CHWs or an SCA would have created no operational concern is belied by the undisputed evidence.

**B.    Fischer's "One to Two Dozen" Estimate Was a Genuine Forward-Looking Assessment of Cumulative Risk Across C&S Ohio.**

Fischer was tasked with evaluating each exemption request individually, and she could not make that evaluation in a vacuum. As Vice President of Clinical Operations for C&S Ohio, Fischer was responsible for accommodation decisions across the broader business and was mindful that Stone's request was one of many pending across her organization. The EEOC's SOF confirms the scope of pending demand: 25 employees applied for religious exemptions and six applied for medical exemptions in C&S Ohio (at least 22 of these were Fischer's employees). ECF No. 89, PAGEID #5887; Decl. Ex. 3. Fischer testified that, while she "looked at each case on a case by case basis," she "also had to remain mindful that there were multiple people who were requesting an exemption with no end date, and that to me could mean that I might have, you know, one or two dozen people who could not go out and do field visits if we were to approve these . . . accommodations." Fischer 99:10-21. That is not speculation: it is exactly the sort of operational judgment that *Groff* contemplates. *See Groff*, 600 U.S. at 470-71; *Kizer v. St. Jude Children's Rsch. Hosp., Inc.*, 741 F. Supp. 3d 726, 749 (W.D. Tenn. 2024), *aff'd sub nom. Kizer v. St. Jude Children's Rsch. Hosp.*, 2024 WL 4816856 (6th Cir. 2024) (quoting *Together Emps. v. Mass Gen. Bringham Inc.*, 573 F. Supp. 3d 412, 437 (D. Mass. 2021)) ("in determining undue hardship, it is appropriate to consider aggregate effects when multiple employees are granted the same accommodation"). A decision-maker in Fischer's position could consider that

7

granting an open-ended, indefinite accommodation to Stone would set the operational baseline for the dozens of other pending requests. Her "one to two dozen" estimate accurately reflected that cumulative reality. This concern is further reflected in the undisputed record, showing member assignments between CMs and CHWs were not static as members could move between intensity levels based on their needs and that if their condition improved or worsened, UHC would adjust their level accordingly. Crandall 38:7-15, 42:12-43:1-16; Fischer 21:6-22:2; 42:1-17; 46:9-24.

The EEOC's suggestion that Fischer was uninformed about Stone's role is unsupported by the record. Fischer became Vice President of Clinical Operations overseeing the Ohio MMP in July 2021, months before Stone's exemption request, and worked directly with Stone's supervisors Gyoker and Tanner to evaluate the requirements of each position, including Stone's. Def.'s SOF ¶50; Fischer 10:22-24; 95:13-98:2; Pl.'s SOF ¶4. Critically, the September 8, 2021 directive from UHC's Human Capital Partner expressly instructed leaders that "[a]ny role where these visits are a normal part of the job (currently *or in the future* as we return to normal operations) should be indicated as yes—even if infrequent," and that only roles where there are "never such visits as part of the employee's regular duties" should be marked no. Tanner Ex. 7 (emphasis added) (attached hereto as Ex. V). Applying that standard, Fischer and Gyoker confirmed that Stone's role would involve both in-home/community contact and provider/office contact—affirmatively designating her as field-based. Tanner 81:4-21, 149:1-21. Regardless, the relevant inquiry under *Henry v. S. Ohio Med. Ctr.* is whether Fischer drew her conclusions "based on evidence and information that was available at the time," 155 F.4th 620, 632 (6th Cir. 2025), not whether the EEOC, with the benefit of hindsight, would have made different decisions.

**C.** **UHC Could Not Compromise Member Safety to Ease Operational Pressures, and Members Had Already Gone Too Long Without Field-Based Care.**

The record confirms that UHC leadership shared, documented, and acted on the operational and contractual concerns driven by the imminent and necessary return to field-based member care. Tanner 129:17-130:1, Def.'s SOF ¶46. In September 2021, Raynee Meyer, Senior Vice President People Business Partner C&S, prepared an analysis of clinical staff, like Stone, with the MCO and NUR job codes, warning that if a health plan fell below 85-90% clinical staffing levels, UHC was "putting our business at significant risk in meeting contractual requirements and member needs." Meyer 94: 20-95:10; 98:14-99:5, Ex. 31-32 (attached as Exs. T-U). Meyer's analysis identified that, as of September 2021, C&S Ohio had 29% of the clinical workforce unvaccinated, leaving only a 71% baseline of compliant clinical staff, well below the contractual threshold. Ex. U. As of November 22, 2021, Tanner reported to C&S leadership that 8.6% of C&S Ohio employees were at risk for being placed on unpaid leave for noncompliance as of November 30, and an additional 5.3% were at "future risk." Decl. Ex. 4. In other words, in addition to Fischer's testimony, contemporaneous undisputed evidence, establishes that C&S Ohio had legitimate concerns about field staff not being able to go into the field and contract compliance.

These undisputed concerns were not abstract. Ohio required face-to-face care management for C&S members, and members had gone without in-person field visits since March 2020. Def.'s SOF¶¶41, 46. UHC was preparing to resume those visits at the State's direction. Def.'s SOF ¶46. As Tanner testified, the State had "expressed that once they asked us to go back to member visits that it was critical that we see these members face-to-face since they had, you know, been home without—without their care coordinators, or CHW, seeing them for so long." Tanner 139:13-23; Def.'s SOF ¶¶43-45. The question Fischer faced was *not* whether

Stone had been in the field *recently*, but whether UHC would have enough field-capable personnel to deliver the resumed care its contracts required.

### D. The SCA Job Description Does Not Define the Outer Limits of Stone's Duties.

The EEOC repeatedly leans on the written SCA job description—and what the EEOC claims that description *does not* say—to argue that in-person and field-based work were not part of Stone's job in 2021, or in the years before the Policy. Pl.'s SOF ¶7. That argument fails. First, every witness with personal knowledge of the SCA role, including Stone herself, confirmed that the job description does not capture the full scope of an SCA's responsibilities. Fischer 38:8-23; Gyoker 21:4-22:20; Stone 65:17-20. Second, the undisputed record establishes that performing and covering field-based duties was critical to the SCA role, inherent in the SCA's supervisory accountability and training for a field-based team of CHWs. Def.'s SOF ¶¶25-39. The EEOC cannot manufacture a fact dispute by pointing to silence in a national job template that multiple witness agrees is incomplete. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (nonmovant cannot rely on mere assertions unsupported by evidence to defeat summary judgment); *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) ("conclusory statements" and "mere speculation" unsupported by specific facts will not permit a party to survive summary judgment).

### E. The EEOC's Demand for the Underlying MMP Contract Is a Red Herring: The Undue Hardship Inquiry Turns on UHC's Understanding of Its Contractual Obligations at the Time, Which the EEOC Does Not Dispute.

The EEOC's argument that UHC's contractual non-compliance concerns fail because UHC "has produced no contract imposing field-based or other in-person requirements on SCAs" is a red herring. ECF No. 89, PAGEID #5887. First, the EEOC concedes that the relevant contractual requirements for member care are summarized in UHC's Level of Care grids, which the EEOC repeatedly cites. *See* Pl.'s SOF ¶8. Second, the record shows the LOC grid was created

10

by managers, such as Stone, to help manage their staff. Fischer 23:2-18; Crandall 39:3-40:16 (grid as a tool created by managers, but noting it was not exhaustive). Nothing in the record suggests that this grid summarized the SCA or any other manager role. Third, the EEOC never requested production of the underlying MMP contract during discovery, and it cannot now manufacture an evidentiary gap by faulting UHC for not producing it. *See* ECF Nos. 36 and 45. Fourth, the relevant inquiry is premised on the undisputed *understanding* of UHC's witnesses at the time about UHC's contractual obligations to the State for field-based care, the State's directive that face-to-face member visits resume, and the consequences of falling below required staffing thresholds. Def.'s SOF ¶¶16-18, 41-46; Fischer 98:1-24; Tanner 129:17-25, 139:8-20; Meyer 47:15-48:19; 58:2-18; Exs. T-U.

F.    **Stone's "Telecommuter" Code in UHC's HR Information System Did Not Determine Whether the Vaccine Policy Applied to Her.**

UHC does not dispute that Stone was coded as a "telecommuter" in its HR system, but the EEOC misstates the undisputed record regarding what that designation *meant* at UHC. ECF No. 89, PAGEID #5887-88; Pl.'s SOF ¶6. Before the pandemic, "the categorization of telecommuter was used primarily by real estate for business planning purposes and tax planning purposes," and "it was not necessarily assigned for the occupational health and safety contact" that drove vaccine policy scoping. Schlaefer 35:20-37:19. It is undisputed that the HR code did not determine whether an employee was in scope for the COVID-19 vaccine policy. *Id*. It is undisputed that this is precisely why UHC's exemption review process did *not* rely on the HR code alone. Tanner 42:16-24, Ex. V (stating UHC had no classification code that easily identified coverage under the Policy). Instead, HR worked with business leaders to assess each employee's actual and anticipated contacts: first, through an initial spreadsheet circulated to managers identifying the categories of in-person contact (in-home/community, provider/office, and long-

11

term care facility) an employee might have, now or as field visits resumed (Tanner 125:15-126:1; Fischer 79:3-82:9; Ex. X); and second, through individualized follow-up between HR and the responsible business leader, as Tanner did with Fischer regarding Stone. Decl. Ex. 6; Tanner 145:14-148:1-23. It is undisputed that this process, not the HR code, governed whether the policy applied. Fischer and Gyoker's analysis of Stone's contacts in her role as a SCA supervising a field-based CHW team—about to resume face-to-face member visits at the State's direction—placed her within the policy's scope regardless of how her location was coded for real-estate and tax purposes.

### G. Stone's Self-Serving Characterization of Her Job Cannot Override the Undisputed Evidence About the Critical Functions of the SCA Position.

The EEOC does not address—and therefore concedes—the uniform, unrebutted testimony of every manager in Stone's chain of command that the SCA role required the ability to go into the field. *See* Def.'s SOF ¶¶26-40, *supra*. The EEOC's Opposition rests almost entirely on Stone's own, self-serving characterization of her job duties. But this Court is not required to credit Stone's self-serving opinion about what her job required. The Sixth Circuit squarely addressed this issue in *EEOC v. Ford Motor Co.*:

> An employee's unsupported testimony that she could perform her job functions from home does not preclude summary judgment . . . . Neither the statute nor regulations nor EEOC guidance instructs courts to credit the employee's opinion about what functions are essential. That's because we do not "allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience." *Mason*, 357 F.3d at 1122.

782 F.3d 753, 763-64 (6th Cir. 2015) (en banc). If an employee cannot unilaterally redefine the essential functions of her position to circumvent an ADA accommodation analysis as in *Ford Motor Co.,* she certainly cannot do so to manufacture a fact dispute for a Title VII claim. The EEOC asks this Court to do precisely what *Ford Motor* forbids: accept Stone's personal opinion (and the EEOC's) about what her position required while disregarding the judgment of the

12

managers who supervised her and who were responsible for ensuring UHC met its contractual obligations to serve vulnerable members.

**H.     The EEOC Conflates UHC's Litigation Defense with What Was Required of Fischer at the Time of Her Decision.**

A core premise of the EEOC's Opposition is that UHC's undue hardship defense should be rejected because, it argues, Fischer did not undertake a rigorous enough process at the time of her decision. That argument fundamentally misstates the undue hardship defense. Undue hardship is an affirmative defense that an employer asserts and proves *in litigation*. It is not a determination the employer was required to label, document, or articulate at the time of the accommodation decision as a condition of preserving it. An employer may defeat a failure-to-accommodate claim by showing that granting the requested accommodation "would have resulted in undue hardship." *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004) (emphasis added); *Gorski v. Ascension St. John Hosp.*, 725 F. Supp. 3d 718, 725 (E.D. Mich. 2024) (undue hardship is a "fact-specific inquiry" and "legal defense" proper for summary judgment); *Hayslett v. Tyson Foods, Inc.*, 2023 WL 11897503, at *13 (W.D. Tenn. 2023) (analyzing whether the accommodation "would have resulted in substantial increased costs").

The only appellate court to address the EEOC's argument in the COVID-19 vaccine context rejected it. In *Bushra v. Main Line Health, Inc.*, 2025 WL 1078135, at *2 (3d Cir. 2025), the plaintiff argued that it was "disingenuous" for the employer to invoke undue hardship when it had denied the religious exemption on other grounds without discussing hardship in the denial. *Id.* at *2 n.14. The Third Circuit rejected the argument, holding that a court "cannot reasonably infer that [the employer] could accommodate [the plaintiff] from the mere fact that it did not discuss the issue in its decision to deny his request on separate grounds." *Id.*

In *Kizer v. St. Jude Children's Rsch. Hosp.,* the Sixth Circuit held: "if the employee fails

13

to create a genuine dispute of material fact that a reasonable accommodation would have allowed her to perform the essential functions of her job, she cannot survive summary judgment on an interactive-process claim." *See* 2024 WL 4816856, at \*4 (6th Cir. 2024). The same logic applies here: even if Fischer had not conducted an individualized analysis at all—which is not the case, as she knew the role and evaluated Stone's role, UHC would still be entitled to prove that granting Stone's open-ended request would have caused undue hardship based on the objective record. Tanner 137:1-138:23; Fischer 79:5-82:9; 100:24-101:7. This defense exists now, regardless of what was communicated or discussed in 2021.

The EEOC mischaracterizes Fischer's reference to "unknowns" by stripping it of context and adding an unsupported gloss to Fischer's testimony. *Drews v. Berrien Cnty., Michigan*, 839 F. App'x 1010, 1013 (6th Cir. 2021) (court "not required to accept unsubstantiated gloss on the evidence"). Fischer's testimony describes the unknowns indisputably inherent in exempting Stone from her in-person "normal" job duties for an indefinite period of time. Fischer 97:10-98:8, 100:14-18. As the manager of a field-based program, Stone occupied a role that Fischer, Stone's direct supervisor Gyoker, and C&S leadership uniformly testified required managers to be available to go into the field. Def.'s SOF ¶39; Gyoker 23:4-6, Meyer 54:17-55:18. Fischer's testimony was unambiguous: Stone "could not be exempted from the Policy because eliminating in-person field work would have been a 'fundamental change to her job.'" Def.'sSOF ¶51. That is not a decision based on unknowns about the requirements of the position but rather, an evaluation of why UHC could not have a manager, who managed field staff, be unable to do core job functions such as going into the field or interacting in person with her staff for an indefinite time, at a time when UHC was indisputably moving staff back in the field to care for patients in desperate need of in-person care after an over 20 month pause in in-person care. Def.'s SOF ¶46.

14

### 1.    UHC's Approval of Other Exemptions Does Not Defeat Its Undue Hardship Defense as a Matter of Law.

The EEOC's related argument—that UHC's approval of certain exemptions (such as for Pamela Bowers and the field-based CM[3]) precludes UHC from establishing undue hardship also fails. ECF No. 89, PAGEID #5886-88. *See* Section V, *infra*. The undue hardship inquiry is individualized; it turns on the circumstances of the particular accommodation request at issue, not on whether the employer approved other requests in different operational contexts.

The Third Circuit in *Bushra* rejected the EEOC's argument, holding that a plaintiff's invocation of other approved exemptions "does not rebut [the employer's] substantial evidence that it could not accommodate him." 2025 WL 1078135, at *2. Put differently—and as many courts have recognized—where there is "substantial evidence of undue hardship" associated with granting an exemption, a plaintiff cannot rely on the approval of other requests to create a genuine dispute of material fact as to the hardship the plaintiff's requested accommodation would impose. *Id.*; *see also Lindahl v. Sheppard Pratt Health Sys., Inc.*, No. 24-1692, 2026 WL 591793, at *10 (D. Md. 2026) (rejecting argument that approval of medical and religious exemptions precluded summary judgment because those requests were not before the court); *Allbright v. S. Cal. Permanente Med. Grp. Inc.*, 793 F. Supp. 3d 1214, 1229 (C.D. Cal. 2025) (rejecting plaintiff's argument that "Defendant cannot claim undue hardship when it has granted religious exemptions to other employees"); *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, , 2022 WL 507479, at *7 (E.D. Pa. 2022) ("Granting Plaintiff's religious exemption request, therefore, even though 24 such requests had already been granted, 'could have put the health of vulnerable

---

[3] The referenced CM's employment ended in April 2022, establishing a clear endpoint to the temporary exemption period. Pl.'s SOF ¶64; Decl. Exs. 6, 7. Moreover, the EEOC does not contend that "Care Managers" are managers and the record contains no evidence to the contrary. Pl.'s SOF ¶8; Fischer 13:15-15:21.

patients at risk.'"). The logic is straightforward: a contrary rule would force employers into a binary choice between granting no exemptions at all or granting all exemptions and undermining the safety of vulnerable members. Title VII does not require that result.

**IV.    The EEOC's Concessions Demonstrate that Stone's Objection to Vaccination Is Not Religious in Nature and Does Not Conflict with the Policy as a Matter of Law.**

The narrow legal questions at issue are whether Stone's particular objection to the COVID-19 vaccine is *religious in nature* and *conflicts with the Policy*, as *DeVore*, 118 F.4th at 845, requires. On the undisputed record, it is not, and it does not.[4]

**A.    The EEOC Cannot Establish Stone's Beliefs are Religious as a Matter of Law.**

UHC has never argued that Catholicism is not a religion or that Stone is not Catholic. But Stone admitted the Catholic Church does not prohibit COVID-19 vaccination. Stone 190:20-25. *See Welsh v. United States*, 398 U.S. 333, 339 (1970).Where the stated religion does not itself prohibit the practice, the Court must distinguish religious from "purely secular," "personal," or "philosophical" objections. *DeVore*, 118 F.4th at 845 (Title VII protects "practices rooted in religious principle," not "purely secular beliefs"); *Guthrie-Wilson v. Cook Cnty.,* 2023 WL 8372043, at *2 (N.D. Ill. Dec. 4, 2023) (religious affiliation alone insufficient absent conflicting tenet).

The EEOC argues the Sixth Circuit has not yet adopted *Africa v. Pennsylvania*, 662 F.2d 1025 (3d Cir. 1981). Nor has the Sixth Circuit *ruled out* adopting *Africa*. Contrary to the EEOC's contention, ECF No. 89, PAGEID #5891, *Africa* does not assess centrality or validity of a religion; it provides a framework for determining whether a belief *is* religious in the statutory sense—fully consistent with *DeVore*'s directive to distinguish religious beliefs from "political,

---

[4] As stated in UHC's opening brief, UHC does not challenge Stone's sincerity for purposes of this motion, nor does it suggest that Stone does not have certain Catholic beliefs.

16

sociological, or philosophical" ones. 118 F.4th at 845. *Africa* is particularly apt where, as here, Stone has disclaimed reliance on the tenets of her stated religion. Def.'s SOF ¶¶64-65. To hold otherwise would convert Title VII into "a limitless excuse for avoiding all unwanted obligations." *DeVore*, 693 F. Supp.at 763. As detailed in UHC's opening brief, it is clear that Stone's objection to the vaccine is *not* religious. *See* ECF No. 81-1, PAGEID #2816-2818.

Contrary to the EEOC's claim, UHC does not judge Stone's extramarital affair. ECF No. 89, PAGEID #5890. The narrow point in UHC's opening brief is: Stone testified that adultery is a "mortal" sin, but that her sexual relationship with a man who was not her husband, while still married, was not adultery, while identifying no scriptural or doctrinal basis for that distinction. Def.'s SOF ¶78. Stone has not shown these are *religious* tenets. *DeVore*, 693 F. Supp. 3d at 763.

### B.    There Is No *Conflict* Between Stone's Beliefs and the Policy.

The EEOC's Opposition skips the "conflict" prong of its *prima facie* case, citing *Lucky v. Landmark Med. of Mich., P.C.*, 103 F.4th 1241 (6th Cir. 2024) and *Sturgill v. Am. Red Cross*, 114 F.4th 803 (6th Cir. 2024)[5] for the proposition that it need not identify a "specific religious tenet" against vaccination. ECF No. 89, PAGEID #5888. This argument misses the mark. Unlike *Lucky* and *Sturgill*, the question is whether Stone's own articulated beliefs conflict with receiving the Policy-required vaccine. ECF No. 89-1, PAGEID #2816. On the undisputed record, they do not.

The EEOC argues that "[b]eliefs need not be consistent to be protected" and Stone's lack of research into fetal-cell-connected products does not preclude a finding of actual conflict. ECF No. 89, PAGEID #5890. However, UHC has shown that Stone's admissions establish that her beliefs do not, in fact, conflict with COVID vaccination. Indeed, Stone's testimony demonstrates the absence of *any* religious conflict with fetal-cell-connected products. The principle Stone

---

[5] Both *Lucky* and *Sturgill* arose from Rule 12(b)(6) dismissals, where well-plead allegations were accepted as true—a posture wholly different from summary judgment.

actually articulates is: if I knew about a product's connection with fetal cells, I object to it; if I do not know, no conflict exists. That is a knowledge-contingent personal rule, *DeVore* 118 F.4th at 845, not a religious conflict with vaccination. And Stone's own admissions establish that the vaccine contains no fetal cells and results in no killing. Def.'s SOF ¶¶66, 70; Pl.'s SOF ¶¶40, 42.

**V.      The EEOC Cannot Establish Disparate Treatment as a Matter of Law.**

**A.      Medical Exemption Requesters Are Not Appropriate Comparators, and the Record Forecloses Any Inference of Religious Animus.**

UHC's approval rate for medical exemptions does not support an inference of religious animus. ECF No. 89, PAGEID #5891-92. Title VII's undue hardship standard for religious accommodations is different than the ADA's for medical accommodations. *See Savel v. MetroHealth Sys.*, 2024 WL 4581542, at *11 (N.D. Ohio 2024), *aff'd*, 2025 WL 1826674 (6th Cir. July 2, 2025). The Supreme Court has expressly declined to import ADA standards into Title VII. *See Groff,* 600 U.S. at 470-73 (refusing to adopt ADA accommodation standard for Title VII). Because the two categories of requests are governed by different legal standards, an employer's approval of a medical request and denial of a religious request does not, without more, support an inference of discrimination. *See Brown v. MGM Grand Casino*, 2024 WL 4819575, at *11 (E.D. Mich. 2024) ("[T]he fact that the [proposed comparator] made a medical accommodation request, whereas Plaintiff made a religious accommodation request, is an important distinction. Medical exemption requests and religious exemption requests are on their face fundamentally different.  . . . . It is not disparate treatment to apply different legal standards to different types of accommodation requests.'")

The operational realities reinforce the legal distinction. The medical exemption requesters in C&S Ohio sought temporary accommodations tied to specific (and short) end dates. Stone's exemption request had no end date. Fischer 98:1-24, 170:16-171:4; 173:8-17. Fischer recalled

18

the longest temporary exemption from field-work that she approved was three months. Fischer 173:8-21. That distinction is dispositive. As the E. D. Tenn. held in *Speer v. UCOR LLC*, only "*permanent* medical exemptions are analogous to religious exemptions . . . a temporary [vaccination] accommodation is much different—and likely much easier to accommodate—than a permanent one." 2024 WL 4370773, at *14 (E.D. Tenn. 2024) (quoting *Short v. Berger*, 593 F. Supp. 3d 944, 951 (C.D. Cal. 2022)) (emphasis in original). Sixth Circuit law requires comparators "similarly situated in all relevant respects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Medical exemption requesters operating under a different legal standard and seeking time-limited accommodations do not meet that test. *Speer* 2024 WL 4370773, at *14 ("when one employee has a condition that prevents vaccination while another employee has no such condition, they are not similarly situated in all relevant respects.")

### B.      A Raw Approval-Rate Comparison Is Not a Valid Statistical Showing.

The EEOC's reliance on raw numbers (*e.g.*, 5 of 6 medical approvals; 2 of 25 religious approvals) is not the kind of "statistical" analysis that can support an inference of discrimination. ECF No. 89, PAGEID #5891-92. The EEOC offers no expert analysis and no controls for role, operational feasibility, accommodation duration, or any other relevant variable. *See Anderson v. Otis Elevator Co.,* 923 F. Supp. 2d 1032, 1061 (E.D. Mich. 2013) ("'statistical evidence' was compiled and presented not through experts but by Plaintiffs' counsel . . . in briefs . . . ."); *E.E.O.C. v. RJB Props., Inc.*, 857 F. Supp. 2d 727, 742 (N.D. Ill. 2012) (generalized statistical data insufficient to support inference of discrimination); *Rosado v. Va. Commonwealth Univ.*, 927 F. Supp. 917, 935 (E.D. Va. 1996).

### C.      The Record Affirmatively Forecloses Any Inference of Religious Animus.

The undisputed record forecloses the EEOC's animus theory. UHC chose not to challenge whether objections were sincere, religious, conflicts at the time, and proceeded to evaluating

19

whether it could accommodate the employee in their particular role. Def.'s SOF ¶11. UHC granted religious exemptions where circumstances permitted: Pamela Bowers, whose role was telephonic-only "waiver touchpoint" outreach with no face-to-face member contact (Pl.'s SOF ¶¶59-60) and Iiyasah Lane, an employee with no member/provider facing duties for whom Fischer excused certain in-person meeting requirements. Pl.'s SOF ¶58; Fischer 84:5-14; 92:19-93:3, Ex. 40 (attached as Ex. W). The EEOC's alleged comparators undermine its theory. ECF No. 89, PAGEID #5882-83. If UHC or Fischer in particular harbored animus against religious objectors because they were religious, the religious requests of Bowers and Lane would have been denied. The argument that UHC could have waived in-person meeting attendance for Stone, as it did for Bowers and Lane, ignores the operational distinction the undisputed record shows: Bowers and Lane were non-managers whose entire role could be performed remotely, whereas Stone was an SCA managing a field-based team about to return to face-to-face member visits.

That UHC could accommodate the few employees whose roles were exclusively telephonic does not establish that it could permanently restructure all supervisory field-based roles. To the contrary, the accommodations of Bowers, Lane, and Melissa Davis[6] confirm that UHC engaged in genuine, individualized analysis-accommodating where possible and declining where the role required field availability. That pattern is operationally driven, evenhanded decision-making—not religious animus. *See Ercegovich*, 154 F.3d at 352-53.

### CONCLUSION

For these reasons and those detailed in UHC's opening brief, the Court should grant UHC's Motion for Summary Judgment.

---

[6] Melissa Davis applied for a religious exemption, which was denied because she was a field-based CHW. After the denial, Davis applied for and received a completely telephonic role. *See* Decl. Ex. 5 (providing Davis' employee ID number) and ECF No. 89-18 PAGEID #6009 (listing Davis' religious exemption request as denied). *See* Fischer 114:10-115:8.

DATE:  June 22, 2026

Respectfully submitted,

SEYFARTH SHAW LLP

By: /s/ *Daniel Birnbaum*

Daniel Birnbaum
DBirnbaum@seyfarth.com
Christopher J. DeGroff (*pro hac vice*)
cdegroff@seyfarth.com
Dawn Reddy Solowey (*pro hac vice*)
dsolowey@seyfarth.com
Jesse M. Coleman (*pro hac vice*)
JMColeman@seyfarth.com
Samantha L. Brooks (*pro hac vice*)
sbrooks@seyfarth.com
SEYFARTH SHAW LLP
233 South Wacker Drive
Suite 8000
Chicago, Illinois  60606-6448
Telephone:      (312) 460-5000
Facsimile:       (312) 460-7000

*Attorneys for Defendant*

21

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing Defendant's Reply

Memorandum of Law in Support of Motion for Summary Judgment with Exhibits T-X, and

Christina Duszlak Declaration with Exhibits 3-7, have been electronically filed and served upon

all counsel of record using the CM/ECF system on this the 22nd day of June, 2026.

> Jessi Isenhart, Trial Attorney
> Emily Datnoff, Trial Attorney
> Taylor Hilton, Trial Attorney
> U.S. Equal Employment Opportunity Commission
> Cleveland Field Office
> 1240 E. 9th Street, Suite 3001
> Cleveland, OH 44199
> jessi.isenhart@eeoc.gov
> emily.datnoff@eeoc.gov
> taylor.hilton@eeoc.gov
>
> *Attorneys for Plaintiff*

> */s/ Daniel Birnbaum*
> Christopher J. DeGroff